Beverly M. SEBETIC and Donald J. Sebetic, Plaintiffs,

v.

Thomas P. HAGERTY, Paul Whiteside, Sr., Donald Andreoli, James Funk, Eugene Bilotti, John Bilotti, Gilbert Dosemagen, John Serpe, and Roger Schoenfeld, Defendants.

Debra HEYDEN, Plaintiff,

v.

Roger SCHOENFELD, John D. Bilotti, John A. Serpe, Stanley Kerkman, Eugene Bilotti, James Funk, and Donald Andreoli, Defendants.

Nos. 84–C–1605, 85–C–1493.

United States District Court, E.D. Wisconsin.

Aug. 12, 1986.

Walter W. Stern, Kenosha, Wis., for plaintiffs.

Frank Volpintesta, Kenosha County Corp. Counsel, Kenosha, Wis., Mary A. Moore, Milwaukee, Wis., for defendants.

## DECISION AND ORDER

MYRON L. GORDON, Senior District Judge.

These cases were brought pursuant to 42 U.S.C. §§ 1983 *et seq.* Because the plaintiffs' factual allegations raise identical legal issues, the cases have been consolidated for all purposes. *See* Local Rule § 4.03. The principal plaintiffs, Beverly Sebetic and Debra Heyden, assert due process, equal protection, and conspiracy claims against various members and officers of the board of directors of the Kenosha City and County Joint Services Board. Plaintiff Donald Sebetic asserts a derivative claim for relief alleging unjustified interference with his marital relationship to Beverly Sebetic and loss of household income. The parties have filed cross motions for summary judgment, pursuant to Rule 56, Federal Rules of Civil Procedure. The defendants' motion will be granted, and the plaintiffs' motion will be denied.

The facts necessary to resolve the pending motions are undisputed. The Kenosha City and County Joint Services Board is a quasi-governmental agency authorized by state statute. *See* Wis.Stat. § 66.508. Under Wis.Stat. § 66.508(7)(d), the Board is empowered "[t]o enact, amend and repeal rules and regulations, not inconsistent with law, ... for the government, operation and maintenance of the safety building and the employes thereof." Kenosha police and sheriff's department dispatchers are Board employes who work out of the safety building. On October 27, 1982, the Board issued a written policy directive providing that "a husband or wife of a Sheriff's Deputy or Police Officer will not be hired as a dispatcher" and that the wife rendered ineligible for employment as a dispatcher pursuant to this policy "would be offered a position in the Records Dept."

The job of dispatcher for Joint Services is described in the record as "public safety communications work ...," linking public safety agency (fire, police, rescue and Sheriff) mobile units with central dispatch. *See* Exhibit "A" attached to Heyden affidavit, at p. 2. "Based upon information received from telephone, teletype and two-way radio transmissions, [dispatchers] are responsible for directing fire, patrol and rescue vehicles to specific areas to cover emergency situations, requests for assistance and calls for service." *Id.*

A Joint Services dispatcher performs a variety of tasks, including determining the need for action as it pertains to law enforcement emergencies; determining the need for the assignment of on-duty vehicles; aiding in the coordination of police efforts in the apprehension of law violators and in the handling of emergency situations by providing an essential communication and information gathering device; and arranging for the safety of patrol officers when the security of the individual is in question. *Id.* Job qualifications include the ability to think and react quickly in emergency situations and the possession of an even temperament with the ability to remain cool and collected under stressful conditions. *Id.* at p. 3.

There is no real dispute regarding the defendants' motivation and perceived justification for establishing the no-spouse policy. The Joint Services Board was concerned with the adverse effects that the marriage relationship could have on the ability of a dispatcher to exercise dispassionate judgment and reasoned discretion in the execution of his or her essential duties. Where the dispatcher's spouse is a law enforcement officer, it was feared, an emergency situation could give rise to a conflict of interest between the dispatcher's ability to react quickly and efficiently and his or her concern for the welfare of his or her spouse. The mix of feelings which typically attends the marriage relationship thus could cripple law enforcement response and decrease the level of safety in the community at large should a dispatcher "become unable to function adequately to handle dispatching duties during such a crisis." *See* first Schoenfeld affidavit, at par. 12.

Debra Heyden applied to the Joint Services Board for a position as a dispatcher in September 1982, before the Board issued

its no-spouse policy. The record indicates that Mrs. Heyden qualified for the job based on an interview and examination and was in a position to be hired when the no-spouse policy was issued. On November 26, 1982, Mrs. Heyden met with defendant Roger Schoenfeld, then the director of the Joint Services Board, who informed her that she would not be offered the job because her husband was a deputy sheriff for Kenosha County. *See also* Exhibit "E" attached to plaintiffs' motion for summary judgment. Since July 1983, Mrs. Heyden has been employed in the Joint Services records department.

Beverly Sebetic was hired by the Board as a dispatcher in January 1983. Mrs. Sebetic was unmarried at the time; her maiden name was Beverly Pettis. On December 17, 1983, Beverly Pettis married Donald Sebetic, a Kenosha County deputy sheriff. On December 23, 1983, defendant Thomas Hagerty, then director of the Joint Services Board, issued a memorandum to "Ms. Beverly Pettis-Sebetic," informing her that her marriage was in conflict with the Board's no-spouse policy and advising that either she or her husband must resign by December 30, 1983. The memorandum also warned that unless one of them resigned by December 30, she would be terminated. Mrs. Sebetic was so terminated. Since August 27, 1984, Mrs. Sebetic has been employed by Joint Services as a records clerk.

The plaintiffs argue that the no-spouse policy creates an unreasonable classification in violation of the fourteenth amendment equal protection clause because it does not apply to the spouses of Kenosha firefighters, to close family relatives other than spouses, or to recordkeepers who also have close daily contact with law enforcement officers. They also argue that the disparate impact of the policy vis-a-vis females constitutes invidious, gender-based discrimination in violation of the equal protection clause. The plaintiffs contend that the policy could be obviated by assigning dispatchers with spouses in Kenosha law enforcement to dispatcher consoles which do not dispatch police or sheriff's department personnel or by assigning such dispatchers to work shifts different from those worked by their police officer or sheriff's department spouses. Plaintiffs also contend that the policy violates substantive due process "by interfering with marital relations and ... with the economic affairs of a husband and wife without legitimate reasons or provable concerns...." *See* plaintiffs' motion for summary judgment at par. 5.

## I. EQUAL PROTECTION

Generally, legislation or official governmental action challenged as denying equal protection of the laws "is presumed to be valid and will be sustained if the classification drawn ... is rationally related to a legitimate [governmental] interest." *City of Cleburne, Tex. v. Cleburne Living Center,* —— U.S. ——, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). "In assessing an equal protection challenge, a court is called upon only to measure the basic validity of the legislative classification." *Personnel Administrator of Mass. v. Fenney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979).

■ The classification drawn by the Joint Services Board in this case is well within the legislative prerogative. A blanket policy proscribing the spouses of Kenosha law enforcement officers from serving as dispatchers can be defended on several alternative, equally rational, grounds. The governmental entity in this case has a legitimate interest in eliminating the potential for serious injury, inefficiency, and disruption in the delivery of crucial public services. The Schoenfeld affidavits clearly illustrate that the no-spouse policy was designed to reduce the incidence of dangerous accidents and mishaps which can occur where the dispatcher's spouse is a police officer or sheriff's deputy. The policy thus bears a rational relation and is a rational means of serving the Board's legitimate end. *See City of Cleburne, Tex., supra,* 105 S.Ct. at 3255.

The plaintiffs' attempt to create a factual issue concerning the sufficiency of the Board's justification for the no-spouse policy cannot be sustained. The Martin and Molette affidavits notwithstanding, plaintiffs' own Exhibit "A" contains objective documentary proof that the job of dispatcher involves discretionary duties and functions, the execution of which have a direct impact on the safety of police officers and sheriff's deputies in the filed. Viewed in this factual context, I find that the no-spouse policy reflects a valid legislative classification. *See Personnel Administrator of Mass., supra,* 442 U.S. at 273, 99 S.Ct. at 2293.

Plaintiffs urge that dispatchers could be assigned to different work shifts from their spouses or to dispatcher consoles which would not bring them into contact with their spouses. The Taran affidavit demonstrates that such an accommodation would be both practically and administratively unworkable.

The plaintiffs' other contentions under the fourteenth amendment equal protection clause are also without merit. The fact that the Board could or perhaps should have drawn the no-spouse policy more broadly to include Kenosha firefighters, other family relatives, or recordkeepers does not render the policy as drawn constitutionally impermissible. "[R]ational distinctions may be made with substantially less than mathematical exactitude." *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976). That the Board chose not to go further than it did does not mean that its legitimate objective of preventing avoidable mishaps in the delivery of law enforcement services is not "rationally furthered" by the choice made. *See Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 316, 96 S.Ct. 2562, 2568, 49 L.Ed.2d 520 (1976); *see also U.S. Railroad Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980), holding that "the fact the line might have been drawn differently at some points is a matter for legislative, not judicial, consideration."

Finally, the plaintiffs have submitted no evidence from which it may reasonably be inferred that the Board's no-spouse policy, neutral on its face, is a pretext for gender discrimination against them as women. The fact that the Joint Services dispatcher's office is comprised largely of female employees does not by itself show that gender-based discrimination "entered into the establishment or formulation of the [no-spouse policy]." *Personnel Administrator of Mass., supra,* 442 U.S. at 273, 99 S.Ct. at 2293. Indeed, the Schoenfeld affidavits suggest that the impact of the policy on Mrs. Sebetic and Mrs. Heyden was not the result of gender-based discrimination, but of wholly gender-neutral considerations and the implementation of a valid public-safety measure. I thus conclude that no "intent to exclude women from significant public jobs was ... at work in this [case]." *Id.* at 277, 99 S.Ct. at 2295; *see also Frock v. United States R.R. Retirement Bd.,* 685 F.2d 1041, 1047–49 (7th Cir.1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983).

## II. DUE PROCESS

The plaintiffs' due process challenge proceeds from the premise that the Board's no-spouse policy impermissibly interferes with the exercise of the fundamental right to marry, thus depriving them of " 'one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.' " *See Zablocki v. Redhail,* 434 U.S. 374, 385, 98 S.Ct. 673, 680, 54 L.Ed.2d 618 (1978), *quoting Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974). This challenge cannot be sustained.

"[R]easonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed." *Zablocki, supra,* 434 U.S. at 386, 98 S.Ct. at 681. Viewing the facts of record in the light most favorable to the plaintiffs, it cannot be said that the Board's no spouse policy significantly interferes with the right to marry. The policy is a reasonable public-safety measure with

minimal residual impact on the decision to marry; indeed, the policy did not deter the plaintiffs themselves from getting married. *Accord Califano v. Jobst,* 434 U.S. 47, 48–49, 98 S.Ct. 95, 96–97, 54 L.Ed.2d 228 (1977); *see also Zablocki, supra,* 434 U.S. at 387, n. 12, 98 S.Ct. at 681, n. 12.

This is not a case, like *Zablocki,* where the challenged provision seriously intrudes into "freedom of choice in an area" of fundamental freedom. 434 U.S. at 387, 98 S.Ct. at 681. The Board has simply recognized that being married to a Kenosha law enforcement officer may interfere with a dispatcher's untrammeled ability to carry out his or her important duties, especially those requiring the exercise of some degree of discretion. An otherwise rational and valid legislative classification, such as that involved in this case, is not rendered invalid "because some persons who might otherwise have married were deterred by the [challenged provision] or because some who did marry were burdened thereby." *Califano, supra,* 434 U.S. at 54, 98 S.Ct. at 99.

### III. CONSPIRACY

 Although the plaintiffs' complaints each contain allegations that the named defendants engaged in a conspiracy to violate their constitutional rights, their summary judgment motion and supporting papers do not raise or pursue the claim further. Be that as it may, to sustain a conspiracy claim under 42 U.S.C. § 1985, the plaintiffs must show " ' . . . some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.' " *Kush v. Rutledge,* 460 U.S. 719, 726, 103 S.Ct. 1483, 1487, 75 L.Ed.2d 413 (1983), *quoting Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). I have already determined that the Board's no-spouse policy does not offend the fourteenth amendment equal protection clause by establishing an unreasonable classification or discriminating on the basis of sex. I conclude that the defendants were not motivated by a class-based, invidiously discriminatory animus and did not engage in a conspiracy to violate the plaintiffs' constitutional rights.

### IV. DERIVATIVE CLAIM

Summary judgment dismissing plaintiff Donald Sebetic's derivative claim will be granted on the same grounds as the court has disposed of plaintiff Beverly Sebetic's claims.

### CONCLUSION

Therefore, IT IS ORDERED that the defendants' motion for summary judgment be and hereby is granted.

IT IS ALSO ORDERED that the plaintiffs' motion for summary judgment be and hereby is denied.

IT IS FURTHER ORDERED that the plaintiffs' complaints be and hereby are dismissed on their merits, with costs.