United States Court of Appeals,

Eleventh Circuit.

No. 94-8097.

Brenda A. PARKS, Plaintiff-Appellant,

v.

CITY OF WARNER ROBINS, GEORGIA, A body politic acting under the authority of the Constitution of the State of Georgia and the Laws of Georgia, the City of Warner Robins, City Council, A Council created under the Laws of the State of Georgia, Ed Martin, in his official capacity as Mayor of the City of Warner Robins, and in his individual capacity, Curtis E. Dempsey, in his official capacity as a member of the City Council, and in his individual capacity, William W. Douglas, in his official capacity as a member of the City Council, and in his individual capacity, et al., Defendants-Appellees.

Jan. 26, 1995.

Appeal from the United States District Court for the Middle District of Georgia. (No. 92-CV-146-3-MAC), Wilbur D. Owens, Jr., Chief Judge.

Before EDMONDSON and BIRCH, Circuit Judges, and HILL, Senior Circuit Judge.

BIRCH, Circuit Judge:

In this appeal, we consider for the first time in our circuit whether a city's anti-nepotism policy denies the fundamental right to marry protected by the Due Process Clause of the Fourteenth Amendment, infringes the right of intimate association implicit in the First Amendment, or has a disparate impact on women in violation of the Equal Protection Clause of the Fourteenth Amendment. The district court held that the anti-nepotism policy is constitutional. We AFFIRM.

I. BACKGROUND

Plaintiff-appellant Brenda Parks is a Sergeant in the Special Investigative Unit of the Warner Robins Police Department, where

she has worked since August, 1984.  In October, 1989, Parks became engaged to A.J. Mathern, a Captain in the Criminal Investigative Unit of the Warner Robins Police Department.  Mathern also began working for the Warner Robins Police Department in August, 1984, approximately two weeks before Parks arrived.  Both Parks and Mathern hold supervisory positions in the police department.

Mathern discussed his plans to marry Parks with George Johnson, Chief of Police for Warner Robins, who informed Mathern that the two would be in violation of Warner Robins' anti-nepotism policy.  Defendant-appellees City of Warner Robins, its mayor and city council ("Warner Robins") adopted the anti-nepotism policy as a city ordinance in 1985. [1]  The anti-nepotism policy prohibits

---

[1]The statute provides in relevant part:

Sec. 18-3. Anti-nepotism.

(a) *Definitions.*  "Relative" is defined to include spouse, child, stepchild, grandchild, parent, grandparent, brother, sister, half-brother, half-sister, uncle, aunt, niece, nephew or the spouse of any of them.  These relationships shall include those arising from adoption.  Persons who are common law married or who are living together without the benefit of matrimony are also considered as relatives under the intent of this rule....

....

(d) *Relatives of supervisory employees.*  Relatives of employees in positions that carry any degree of supervision shall not be employed anywhere in the department in which the supervisor works, but may be employed in other departments of the city.

(e) *Relatives of nonsupervisory employees.*  Subject to the foregoing provisions, relatives of nonsupervisory employees may be employed by the city in any position which they are qualified to fill.

....

relatives of city employees in supervisory positions from working in the same department. Warner Robins, Ga., Code § 18-3(d). The prohibition does not extend to nonsupervisory employees, nor does it prevent relatives of supervisory employees from working in other departments of the city. Johnson told Mathern that if the two married, the less-senior Parks would have to leave the police department. Rather than losing her job, Parks postponed the wedding and brought the instant lawsuit; Parks and Mathern have remained engaged, but unmarried, for over four years.

Arguing that Warner Robins' anti-nepotism policy infringed her First Amendment right of intimate association by conditioning her employment on the nonassertion of her right to marry, Parks sought declaratory and injunctive relief under 42 U.S.C. § 1983 and 28 U.S.C. § 2201. Parks also contended that the policy violated both the Due Process Clause of the Fourteenth Amendment by denying her fundamental right to marry and the Equal Protection Clause of the Fourteenth Amendment by having a disparate impact upon women. On

> (g) *Employees who become related subsequent to employment.* The limitations on employment of relatives specified in this section shall apply to the continued employment of persons who become relatives subsequent to their employment by the city due to their getting married to each other. If an appropriate transfer cannot be arranged, the less senior employee will be terminated.
>
> ....
>
> (i) This section shall be effective March 18, 1985.
>
> Warner Robins, Ga., Code § 18-3. The Warner Robins anti-nepotism policy also includes provisions restricting the employment of relatives of elected and appointed officials, purchasing and personnel department employees, and the mayor's staff. *See id.* § 18-3(b), (c), (h).

motion for summary judgment, the district court found that the policy was not a direct restraint on the right to marry; consequently, the court applied rational basis scrutiny to the policy and found that the statute was constitutional under both the First Amendment and Due Process Clause. The district court dismissed Parks' Equal Protection Clause claim after finding that she had "set forth no evidence that would indicate that the alleged unequal application [of the policy] was in any way the result of purposeful discrimination." R2-58-18. Finding no constitutional infirmities in the challenged policy, the district court granted Warner Robins' summary judgment motion, 841 F.Supp. 1205.

## II. DISCUSSION

On appeal, Parks argues that the district court erred by granting summary judgment to Warner Robins. Specifically, Parks realleges her substantive due process right to marry, her right of intimate association, and her disparate impact claims. A district court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A moving party is entitled to summary judgment if the nonmoving party has "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

We review the district court's grant of summary judgment *de*

*novo,* applying the same legal standards used by the district court. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1117 (11th Cir.1993). Additionally, we note that we may affirm the district court's decision on any adequate ground, even if it is other than the one on which the court actually relied. *Id.*

A. *Substantive Due Process*

Parks argues that Warner Robins' anti-nepotism policy violates her substantive due process rights by denying her the fundamental right to marry. That the right to marry is a fundamental right protected by the substantive component of the Due Process Clause of the Fourteenth Amendment is well established. *See, e.g., Planned Parenthood v. Casey,* --- U.S. ----, ----, 112 S.Ct. 2791, 2805, 120 L.Ed.2d 674 (1992); *Zablocki v. Redhail,* 434 U.S. 374, 383-85, 98 S.Ct. 673, 679-81, 54 L.Ed.2d 618 (1978); *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010 (1967); *McCabe v. Sharrett,* 12 F.3d 1558, 1562 (11th Cir.1994).[2]

---

[2]We cite *McCabe* for the proposition that the right to marry is a fundamental right. Parks would have us go further and follow our analysis in *McCabe* rather than the Supreme Court's line of right-to-marry cases beginning with *Loving.* In *McCabe,* we used three separate standards to evaluate a police chief's decision to reassign his personal secretary to another department after she married one of his subordinates. Unlike the legislative act embodied in Warner Robins' anti-nepotism policy, however, the secretary's reassignment in *McCabe* was a quintessentially executive act. *See McKinney v. Pate,* 20 F.3d 1550, 1557 n. 9 (11th Cir.1994) (en banc) (distinguishing executive acts, which "characteristically apply to a limited number of persons" and which "typically arise from the ministerial or administrative activities of members of the executive branch" from legislative acts, which "generally apply to a larger segment of ... society" and which include "laws and broad-ranging executive regulations").

We applied three separate tests in *McCabe* because the

Nevertheless, the Supreme Court has held that not every statute "which relates in any way to the incidents of or prerequisites for marriage" must be subjected to strict scrutiny. *Zablocki,* 434 U.S. at 386, 98 S.Ct. at 681. "To the contrary, reasonable regulations that do not *significantly interfere* with decisions to enter into the marital relationship may legitimately be imposed." *Id.* (emphasis added). Therefore, whether we examine this ordinance under strict scrutiny or rational basis analysis depends upon whether the statute "significantly interfere[s]" with the decision to marry.

A statutory classification must interfere "directly and substantially" with the right to marry before it violates the Due Process Clause. *Zablocki,* 434 U.S. at 387, 98 S.Ct. at 681. In *Loving,* the seminal case, the Court struck down as violative of the "freedom of choice to marry" an anti-miscegenation statute that voided interracial marriages and made them punishable as felonies. *Loving,* 388 U.S. at 4, 12, 87 S.Ct. at 1819-20, 1824. The statute at issue in *Loving* also provided that residents of Virginia who left the state to enter into interracial marriages were subject to criminal punishment upon returning to Virginia. *Id.* at 4, 87 S.Ct.

-----

Supreme Court had yet to decide which test delimits the effect that an executive act can have upon the fundamental right to marry. *See McCabe,* 12 F.3d at 1564, 1567-74. As discussed in the opinion following, however, the Supreme Court has on several occasions addressed the extent to which legislative acts may infringe upon the right to marry. Moreover, in the context of a substantive due process challenge, we have recently held that "[t]he analysis ... that is appropriate for executive acts is *inappropriate* for legislative acts." *McKinney,* 20 F.3d at 1557 n. 9. We therefore decline to extend the analysis that we used in *McCabe* to legislative acts, such as the one at issue here.

at 1819. Similarly, in *Zablocki,* the Court ruled unconstitutional a state statute that required Wisconsin residents with child support obligations to obtain a court order before they could marry. *Zablocki,* 434 U.S. at 387, 390-91, 98 S.Ct. at 681, 683. Under the statute, courts could grant such permission only if the obligated parent could produce proof of support and could demonstrate that the children so supported were " "not then and [were] not likely thereafter to become public charges.' " *Id.* at 375, 98 S.Ct. at 675. The statute voided marriages contracted in any jurisdiction without the required court order and subjected violators to criminal punishment. The Supreme Court concluded that these statutes were impermissible direct restraints on the freedom to marry. *Id.* at 387, 390-91, 98 S.Ct. at 681, 683-84; *Loving,* 388 U.S. at 12, 87 S.Ct. at 1824.

In holding that the statute in *Zablocki* violated the Due Process Clause, the Court noted that

> [s]ome of those in the affected class ... will never be able to obtain the necessary court order.... These persons are absolutely prevented from getting married. Many others, able in theory to satisfy the statute's requirements, will be sufficiently burdened by having to do so that they will in effect be coerced into forgoing their right to marry.

*Id.* at 387, 98 S.Ct. at 681.

In contrast to its ruling in *Zablocki,* the Court in the same term upheld a Social Security provision that terminated benefits to a secondary beneficiary if he or she married a person ineligible for Social Security benefits. *Califano v. Jobst,* 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977). As the Court explained in *Zablocki,*

[t]he directness and substantiality of the interference with

> the freedom to marry distinguish the instant case from ...
> [*Jobst* ]. The Social Security provisions placed no direct
> legal obstacle in the path of persons desiring to get married,
> and ... there was no evidence that the laws significantly
> discouraged, let alone made "practically impossible," any
> marriages.

*Zablocki,* 434 U.S. at 387 n. 12, 98 S.Ct. at 681 n. 12 (citation omitted).

We conclude that the Warner Robins anti-nepotism policy does not "directly and substantially" interfere with the right to marry. The policy does not create a direct legal obstacle that would prevent absolutely a class of people from marrying. While the policy may place increased economic burdens on certain city employees who wish to marry one another, the policy does not forbid them from marrying. *See Jobst,* 434 U.S. at 58, 98 S.Ct. at 101 (upholding a Social Security provision despite the fact that it "may have an impact on a secondary beneficiary's desire to marry, and may make some suitors less welcome than others"). The true intent and direct effect of the policy is to ensure that no city employee will occupy a supervisory position vis-a-vis one of his or her relatives. *See Keckeisen v. Independent School District 612,* 509 F.2d 1062, 1065 (8th Cir.) (distinguishing an anti-nepotism statute from the anti-miscegenation law in *Loving* by reasoning that the former "does not deny to people the right to marry; it only prohibits the employment of married couples in administrator-teacher situations"), *cert. denied,* 423 U.S. 833, 96 S.Ct. 57, 46 L.Ed.2d 51 (1975). Any increased economic burden created by the anti-nepotism policy is no more than an incidental effect of a policy aimed at maintaining the operational efficiency of Warner Robins' governmental departments, not a direct attempt to

control the marital decisions of city employees. *Cf. Jobst,* 434 U.S. at 54 n. 11, 98 S.Ct. at 100 n. 11 ("Congress adopted this rule in the course of constructing a complex social welfare system that necessarily deals with the intimacies of family life. This is not a case in which government seeks to foist orthodoxy on the unwilling by banning, or criminally prosecuting nonconforming marriages.").

Moreover, individual instances of hardship notwithstanding, the anti-nepotism policy at issue here does not make marriage " "practically impossible' " for a particular class of persons. Although Parks and Mathern have postponed their wedding for over four years, pending the outcome of this case, they have produced no evidence of other couples similarly deterred by the policy, nor do we believe that ordinarily such will be the case. As the Supreme Court noted in *Jobst,* a statute "is not rendered invalid simply because some persons who might otherwise have married were deterred by the rule or because some who did marry were burdened thereby." *Id.* at 54, 98 S.Ct. at 99.[3]

---

[3]*See also Lyng v. International Union, United Auto., Aerospace and Agric. Implement Workers,* 485 U.S. 360, 365-66 & n. 3, 108 S.Ct. 1184, 1189 & n. 3, 99 L.Ed.2d 380 (1988) (holding that a statute did not " " "directly and substantially" interfere with family living arrangements' " despite district court's finding that the wife and children of one striking worker left his household after he was denied food stamps and that the couple subsequently divorced (quoting *Lyng v. Castillo,* 477 U.S. 635, 637, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986) (quoting *Zablocki,* 434 U.S. at 386-87 & n. 12, 98 S.Ct. at 681 & n. 12))); *Bowen v. Gilliard,* 483 U.S. 587, 601-02, 107 S.Ct. 3008, 3017, 97 L.Ed.2d 485 (1987) ("That some families may decide to modify their living arrangements in order to avoid the effect of the amendment, does not transform the amendment into an act whose design and direct effect are to "intrud[e] on choices concerning family living arrangements.' " (quoting *Moore v. East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 1936, 52 L.Ed.2d 531 (1977)

Because the Warner Robins policy does not directly and substantially interfere with the fundamental right to marry, we subject the policy to rational basis scrutiny. *Id.* at 53-54, 98 S.Ct. at 99.[4] Accordingly, the statute will not violate the Due Process Clause if it is rationally related to a legitimate government interest. Warner Robins has advanced several such interests: avoiding conflicts of interest between work-related and family-related obligations; reducing favoritism or even the appearance of favoritism; preventing family conflicts from affecting the workplace; and, by limiting inter-office dating, decreasing the likelihood of sexual harassment in the workplace. A rule that would prevent supervisory employees from having to exercise their discretionary power to hire, assign, promote, discipline or fire their relatives is rationally related to each of

---

(alteration in original))); *Castillo,* 477 U.S. at 635, 106 S.Ct. at 2729 (finding no direct and substantial interference with family living arrangements despite the fact that "the loss or reduction of [food stamp] benefits [as a result of a recipient's decision to live in the same household as his family] will impose a severe hardship on a needy family, and may be especially harmful to the affected young children for whom an adequate diet is essential").

[4]Following the *Zablocki* rule, at least two other circuits and two federal district courts have held that anti-nepotism laws do not trigger strict scrutiny. *Parsons v. County of Del Norte,* 728 F.2d 1234, 1237 (9th Cir.) (per curiam), *cert. denied,* 469 U.S. 846, 105 S.Ct. 158, 83 L.Ed.2d 95 (1984); *Cutts v. Fowler,* 692 F.2d 138, 141 (D.C.Cir.1982); *Sebetic v. Hagerty,* 640 F.Supp. 1274, 1277-78 (E.D.Wis.1986), *aff'd sub nom. Heyden v. Schoenfeld,* 819 F.2d 1144 (7th Cir.), *cert. denied,* 484 U.S. 899, 108 S.Ct. 235, 98 L.Ed.2d 193 (1987); *Southwestern Community Action Council, Inc. v. Community Servs. Admin.,* 462 F.Supp. 289, 297-98 (S.D.W.Va.1978); *cf. Sioux City Police Officers' Assoc. v. City of Sioux City,* 495 N.W.2d 687, 696 (Iowa 1993) (citing *Zablocki* in upholding city's anti-nepotism statute against substantive due process challenge and listing other state courts that have found anti-nepotism policies constitutional).

these practical, utilitarian goals. *See Parsons v. County of Del Norte,* 728 F.2d 1234, 1237 (9th Cir.) (per curiam) (upholding under rational basis scrutiny an anti-nepotism statute as a means of avoiding conflicts of interest and favoritism), *cert. denied,* 469 U.S. 846, 105 S.Ct. 158, 83 L.Ed.2d 95 (1984); *Cutts v. Fowler,* 692 F.2d 138, 141 (D.C.Cir.1982) (same). Therefore, we hold that the anti-nepotism policy adopted by Warner Robins is a reasonable attempt to achieve legitimate government interests; as such, it is valid under the Due Process Clause.

B. *First Amendment Right of Intimate Association*

Parks contends that the Warner Robins policy violates the First Amendment by making her continued employment contingent on the nonassertion of her right to marry. The First Amendment contains no explicit right of association. Nonetheless, the Supreme Court "ha[s] long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees,* 468 U.S. 609, 622, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984).

Included in this First Amendment right of association is the right to enter into certain intimate or private relationships, such as family relationships. *See id.* at 619, 104 S.Ct. at 3250 (naming marriage as an example of constitutionally protected intimate association). This is true even though the primary purpose of such intimate associations may not be expressive. *See Board of Directors of Rotary Int'l v. Rotary Club,* 481 U.S. 537, 545-50, 107

S.Ct. 1940, 1945-48, 95 L.Ed.2d 474 (1987) ("We have emphasized that the First Amendment protects those relationships, including family relationships, that presuppose "deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.' " (quoting *Roberts,* 468 U.S. at 619-20, 104 S.Ct. at 3250)); *Cummings v. DeKalb County,* 24 F.3d 1349, 1354 (11th Cir.1994) (recognizing that intimate association is protected by the First Amendment); *Wilson v. Taylor,* 733 F.2d 1539, 1544 (11th Cir.1984) (holding that dating is a type of association protected by the First Amendment).

Although the right to marry enjoys independent protection under both the First Amendment and the Due Process Clause, the Supreme Court has held that the same analysis applies in each context.  In *Lyng v. International Union, United Auto., Aerospace and Agric. Implement Workers,* 485 U.S. 360, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988), the Court extended the reasoning in *Zablocki* to apply to claims involving First Amendment associational rights. *Id.* at 364-67, 108 S.Ct. at 1189-90.  The Court examined a Food Stamp Act provision that denied increased food stamp benefits to families of striking workers.  The Court held that the food stamp statute did not infringe upon the striking workers' right to associate with their families because it did not " "order' any individuals not to dine together;  nor [did] it in any way " "directly and substantially" interfere with family living arrangements.' "  *International Union,* 485 U.S. at 365-66, 108

S.Ct. at 1189 (quoting *Lyng v. Castillo,* 477 U.S. 635, 638, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986) (quoting *Zablocki,* 434 U.S. at 387, 98 S.Ct. at 681)).

The Warner Robins anti-nepotism policy does not "order" individuals not to marry, nor does it "directly and substantially" interfere with the right to marry. *See supra* Part II.A. Admittedly, the policy presents a harder case than did the food stamp provision at issue in *International Union;* individuals forced by the policy to leave their jobs may incur economic losses greater than the temporary denial of food stamp benefits. *But see supra* note 3. Because the anti-nepotism policy does not prevent the less-senior spouse from working in another department or outside the Warner Robins municipal government, however, it is unlikely that the policy will actually prevent affected couples from marrying. In this respect, Warner Robins' anti-nepotism policy is similar to the food stamp provision in *International Union,* for which the Court concluded: "Even if isolated instances can be found in which a striking individual may have left the other members of the household in order to increase their allotment of food stamps, "in the overwhelming majority of cases [the statute] probably has no effect at all.' " *International Union,* 485 U.S. at 365, 108 S.Ct. at 1189 (quoting *Castillo,* 477 U.S. at 638, 106 S.Ct. at 2729).

In *International Union,* the Court held that the petitioners' associational rights claim was "foreclosed" by its inability to satisfy the direct and substantial interference standard first used in *Zablocki* and followed in *Castillo.* *Id.* at 364, 108 S.Ct. at

1189. Parks has similarly failed to show that the Warner Robins anti-nepotism statute directly and substantially interferes with her right to marry. Consequently, we hold that the policy does not infringe upon her First Amendment right of intimate association.

C. *Equal Protection Clause: Gender Discrimination*

Parks' final argument on appeal is that the Warner Robins policy will result in a disparate impact on women because the city employs a greater number of men as supervisors. A gender-based classification violates the Equal Protection Clause of the Fourteenth Amendment if the classification is not substantially related to the achievement of important governmental objectives. *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979); *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976).

Additionally, proof of discriminatory intent or purpose is a necessary prerequisite to any Equal Protection Clause claim. *Hernandez v. New York,* 500 U.S. 352, 359-60, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) ("A court addressing this issue must keep in mind the fundamental principle that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact.... Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.' " (omission in original) (quoting *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 264-265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977))); *accord Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976); *Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394,

1406 (11th Cir.1993). This requirement applies with equal force to a case involving alleged gender discrimination. *Personnel Adm'r v. Feeney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979) ("When a statute gender-neutral on its face is challenged on the ground that its effects upon women are disproportionately adverse, a twofold inquiry is thus appropriate.... [T]he second question is whether the adverse effect reflects invidious gender-based discrimination."). Possible indicia of discriminatory intent include a clear pattern of disparate impact, unexplainable on grounds other than race; the historical background of the challenged decision or the specific events leading up to the decision; procedural or substantive departures from the norm; and the legislative or administrative history of the challenged statute. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 266-68, 97 S.Ct. 555, 564-65, 50 L.Ed.2d 450 (1977).

Parks' disparate impact claim relies upon her assertion that eighty-four percent of Warner Robins' supervisory employees are men. Consequently, she argues, a disproportionate number of employees who are forced to transfer to another department or to leave the city's employ will be women. As the Supreme Court's holding in *Personnel Adm'r v. Feeney* indicates, such a showing is insufficient to prove discriminatory intent. In *Feeney,* the Court upheld a state law that created an absolute hiring preference for military veterans applying for state jobs. *Feeney,* 442 U.S. at 275, 99 S.Ct. at 2294. At the time that the litigation commenced, over ninety-eight percent of the veterans in Massachusetts were

male, and over one-fourth of the Massachusetts population were veterans. *Id.* at 270, 99 S.Ct. at 2291. The Court described the impact of the Massachusetts plan on women as "severe." *Id.* at 271, 99 S.Ct. at 2292.

The *Feeney* Court rejected the plaintiff-appellee's argument that because a disparate impact against women was the obvious consequence of the statute's enactment, the Massachusetts legislature must have intended to discriminate against women. The Court held that " "[d]iscriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part "because of,' not merely "in spite of,' its adverse effects upon an identifiable group." *Id.* at 279, 99 S.Ct. at 2296 (citation and footnote omitted). Assuming *arguendo* that Parks has demonstrated disparate impact, her equal protection claim must still fail for lack of a showing of discriminatory intent. *See id.* at 274, 99 S.Ct. at 2293 ("[I]mpact provides an "important starting point,' but purposeful discrimination is "the condition that offends the Constitution.' " (quoting *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 564, and *Swann v. Charlotte-Mecklenburg Bd. of Educ.,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971))); *Arlington Heights,* 429 U.S. at 265, 97 S.Ct. at 563 (" "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination.' " (quoting *Davis,* 426 U.S. at 242, 96 S.Ct. at 2049)).

Parks' allegations cite none of the other traditional indicia

of discriminatory intent listed by the Court in *Arlington Heights.* She has not alleged facts surrounding the city's decision to apply the policy to her that could indicate discriminatory intent, nor has she identified any such intent in the legislative history of the statute. Her situation is not the result of any procedural or substantive departures from the norm that would reveal discriminatory intent. In her brief, Parks lists four city employees as examples of individuals who remain on the city payroll despite their alleged violation of the anti-nepotism policy. Since three of the four people who have allegedly retained their jobs in violation of the policy are female, however, it cannot be argued that the city has applied the policy unevenly so as to disadvantage women. *Cf. Yick Wo v. Hopkins,* 118 U.S. 356, 359, 6 S.Ct. 1064, 1066, 30 L.Ed. 220 (1886) (finding that a city board of supervisors violated the Equal Protection Clause when it administered a facially-neutral city ordinance so as to deny certain business permits to all Chinese-American petitioners while granting similar permits to all but one Caucasian petitioner).

As the Court previously has observed, "the Fourteenth Amendment guarantees equal laws, not equal results." *Feeney,* 442 U.S. at 273, 99 S.Ct. at 2293. Parks has offered to demonstrate that more women than men will be transferred or fired as a result of Warner Robins' anti-nepotism policy. Such an allegation falls short of the showing of discriminatory purpose or intent necessary to support a disparate impact claim under the Equal Protection Clause. Therefore, we hold that the policy does not deny women equal protection of the laws as guaranteed by the Fourteenth

Amendment.

### III. CONCLUSION

Parks challenges the district court's grant of summary judgment, in which the court upheld the constitutionality of Warner Robins' anti-nepotism policy. She contends that the policy impermissibly infringes her fundamental right to marry protected by the Fourteenth Amendment, her right of intimate association implicit in the First Amendment, and her right to equal protection of the laws under the Fourteenth Amendment. Because the Warner Robins policy is not a direct and substantial interference with the right to marry, and because Parks has failed to allege facts sufficient to support a finding that the policy conceals a discriminatory intent, we hold that the policy is valid under the First and Fourteenth Amendments. We AFFIRM.