FAHS, Collector of Internal Revenue, v. TREE–GOLD CO–OP. GROWERS OF FLORIDA, Inc.

UNITED STATES v. GENTILE BROS. CO.

No. 11961.

Circuit Court of Appeals, Fifth Circuit.

Feb. 3, 1948.

Irving I. Axelrod and Sewall Key, Sp. Assts. to Atty. Gen., and Herbert S. Phillips, U. S. Atty., and Joseph E. Gillen, Asst. U. S. Atty., both of Tampa, Fla., for appellants.

Charles O. Andrews, Jr., of Orlando, Fla, for appellees.

Before SIBLEY, HOLMES, and LEE, Circuit Judges.

HOLMES, Circuit Judge.

These two cases were consolidated for trial in the court below; and, after separate judgments had been entered, it was stipulated by the attorneys for all parties that they also be consolidated for the record and hearing on appeal. They involve taxes for the period extending from January 1, 1937, to March 31, 1940, and for the calendar years 1937, 1938, and 1939, under Titles VIII and IX, respectively, of the Social Security Act, 42 U.S.C.A. §§ 1001 et seq., 1101 et seq., and corresponding provisions of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, §§ 1400 et seq., 1600 et seq.

The question presented is whether certain individuals who assembled fruit boxes, labeled, filled, and loaded them for transportation, were, when performing these services, employees of the taxpayers within the meaning of Sections 811(b) and 907 (c) of the Social Security Act, and Sections 1426(b) and 1607(c) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, §§ 1426(b), 1607(c). The facts touching the question here in dispute, as found by the court below, are substantially as follows:

During the years in question, the taxpayer was engaged in the business of producing, harvesting, packing, and market-

SIBLEY, Circuit Judge, dissenting.

ing citrus fruits and the products thereof; and, as a part of its business, owned and operated, among others, a packing house in Winter Park in Orange County, Florida. A part of the business of taxpayer, which was carried on in its packing house, consisted in preparing boxes for the fruit, securing the lids when filled, and loading the boxes for shipment. In the performance of these operations in its packing house, the taxpayer employed contractors at a stipulated rate per box. Each contractor was under an individual contract, and acted at various periods during the years in question. The contractor performed all or part of the boxing operations for the taxpayer, and employed such workmen as were necessary to accomplish what was intended. Under the terms of its contract with the respective individuals so employed as contractors, the taxpayer made payments to each, calculated upon the number of boxes handled by each contractor at the contracted rate per box.

The taxpayer used different types of boxes in which to pack its fruit and fruit products. Some were bought by the taxpayer in a knocked-down condition and unloaded from freight cars, whence they were carried to the second floor of the packing house, where they were assembled. Those boxes were bound by wire, and when received there were six boxes to a bundle. One of the companies that sold the boxes furnished the tools that were used in pushing the wires together and thus making the boxes. Another type of box, called the standard box consisted of three sides, two ends, a middle, and two bottoms. Such boxes were nailed together as contrasted with the wire-bound boxes, and constituted only a small portion of the total boxes used. They also were stored on the second floor and assembled there. During the years involved, the annual number of all boxes used averaged 300,000. During the seasons of 1937–1938 the contractor was paid 85¢ per one hundred boxes assembled. For the season 1938–1939, he was paid 62½¢ per one hundred boxes assembled. He was paid at the end of each week on the basis of the boxes shipped during the week, as shown by the manifest of the taxpayer. At the end of the season, if more boxes had been

assembled than were shipped, the contractor counted such boxes and was paid for them at the same rate per hundred. The contractor and his employees unloaded the knocked-down boxes from freight cars and trucks, and put them on the conveyor which carried them up to the second floor. There was enough space on the second floor for the knocked-down boxes and for a one-day's supply of assembled boxes, which generally consisted of two thousand to four thousand boxes.

In addition to assembling the boxes, the contractor and his employees stamped and labeled them to show the different grades of fruit which they were to contain. In order for them to know how many boxes to assemble, the taxpayer would tell them the approximate number that would be needed each day, and would also state the size of the boxes that would be required, the stamp to be used, and the label to be put on them, that is, whether for the best grade or a lesser grade. The nails and nailing machine used in the assembling of the standard boxes were furnished by the taxpayer. During the season, the contractor worked under his contract exclusively for the taxpayer, and did not hold himself out as being available to the public. His employees needed no skill or experience for the work that they performed. They were covered by Workmen's Compensation taken out by the taxpayer. The contractor reported and paid social security taxes covering his employees. Their hours were substantially the same as admitted employees of the taxpayer, except on occasions when work had to be done at night in order to assemble the necessary number of boxes in which fruit was to be packed. During the time that these employees worked, assembling boxes, their entire time was absorbed by such work, and the compensation therefor constituted their only source of income. Prior to the 1937–1938 season, one of the contractors had worked as an employee of taxpayer on an hourly basis doing the same work for the taxpayer.

Another contractor and his employees did the lidding, or fastening down the tops of the boxes, after the fruit had been packed. This work was done on a conveyor when the boxes came from the packers. The

fastening or nailing was done on the first floor of the packing house, and in close proximity to the admitted employees of the taxpayer. On some occasions, instructions in respect to the nailing and lidding of the boxes were given directly to the employees of the contractor by the foreman or supervisor of the taxpayer. This contractor was paid 87½¢ per one hundred boxes fastened or lidded, and was paid at the end of each week on the basis of the boxes shipped during the week.

Still another contractor loaded the boxes of fruit for the taxpayer. He was paid at the rate of 87½¢ per one hundred boxes loaded, and received compensation at the end of the week on the basis of the boxes shipped during the week. The loading was carried on by the contractor and his employees by the use of hand-trucks, in which the boxes were removed from the conveyor and carried to the freight cars or trucks, where they were loaded. The packing-house manager gave instructions to the contractor as to whether the boxes were to be loaded on trucks or freight cars, the types of boxes to be loaded, and the place of destination. The boxes were shipped mainly in carload or truckload lots with only a few exceptions when the oranges were used to fill out already partially filled cars or trucks. For the 1939–1940 season this contractor performed all three operations, that is, the assembling, lidding, and loading of boxes, for which he was compensated at the agreed rate of $1.35 per one hundred boxes. He hired all of his employees, some of whom were proposed by the taxpayer.

Except to instruct or inform the contractors or their employees as to the labels to be placed upon the boxes, the number of boxes to be required in the immediate future, and to caution all concerned about removing cut fruit, or to draw attention to defective work that did not comply with the specifications, the company exercised no control over the contractors or their employees. Except to object to incompetent or careless workmen, or disorderly conduct by them on the premises, the company had no right to interfere with the full authority of the contractor to employ or discharge whomsoever he pleased. The company had no right to control the number of employees, their wages, or hours worked. The company had the right to insist that the work of the contractor keep pace with the requirements of the company; but whether this was accomplished by a large number of men working short hours or a small number working long hours was not within the company's control. The method of contracting for this work was current among packing houses.

All the moneys paid by the taxpayer, as taxes herein sought to be recovered, were moneys that belonged to the taxpayer, and included no moneys that had been deducted from the amount due or paid the named individuals.

The district court found that the payments made by the taxpayer to the named individuals, with respect to which the taxes were assessed and collected, were paid to the named individuals as independent contractors, and were not wages for employment within the meaning of Titles VIII and IX of the Social Security Act. The court also found that the relationship of employer and employee did not exist between the taxpayer and the named individuals and their employees with respect to the operations performed for the taxpayer, for which payments were made by the taxpayer to the named individuals as above found.

At the time of the decision below, the common-law tests of master and servant were widely thought to be controlling upon the courts in determining the ultimate fact of whether the persons in question were employees of the taxpayer. The weight of authority among the Circuit Courts of Appeals was to the effect that the common-law distinction between master and servant and independent contractor constituted the ultimate test in determining whether a person performing services for another was to be considered an employee for purposes of the Social Security Act.[1] The critical

[1] Deecy Products Co. v. Welch, 1 Cir., 124 F.2d 592, 139 A.L.R. 916; American Oil Co. v. Fly, 5 Cir., 135 F.2d 491, 147 A.L.R. 824; United States v. Vogue, Inc., 4 Cir., 145 F.2d 609; Glenn v. Standard Oil Co., 6 Cir., 148 F.2d 51; McGowan v. Lazeroff, 2 Cir., 148 F.2d 512; United States v. Aberdeen Aerie,

question under that view was whether the person for whom the services were performed had the right to control and direct the individual who performed the services, not only as to the result to be accomplished by the work, but also as to the details and means by which that result was accomplished.[2] It was that concept which the trial court deemed itself required to apply to the evidentiary facts in making its ultimate finding of whether or not the persons in question were employees of the taxpayer.[3]

■ We need not now decide whether the facts as found by the court below upon the question of control, when taken with the other circumstances of the employment, are sufficient to require an ultimate finding that the persons were employees; because the Supreme Court, in a series of recent decisions, has announced the view that coverage under the Social Security Act should be determined on the basis of the rationale applied by it in cases involving the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., and the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.[4] Under this view, while recognizing that it is an element characteristically associated with the employer-employee relationship and to be considered, the question of control is not the sole or determining factor.[5] The ultimate criteria are to be found in the purposes of the act.[6]

■■ Under these decisions, the act is intended to protect those whose livelihood is dependent upon finding employment in the business of others. It is directed toward those who themselves are least able in good times to make provisions for their needs when old age and unemployment may cut off their earnings.[7] The statutory coverage is not limited to those persons whose services are subject to the direction and control of their employer, but rather to those who, as a matter of economic reality, are dependent upon the business to which they render service.

■■ From the facts disclosed in the record, we are of opinion that the services in question constituted a part of an integrated economic unit devoted to the packing of citrus fruit and fruit products. The work was simple, requiring no skill or experience, and was of relative permanence. None of the contractors had any investment in facilities, since the substantial tools and premises were furnished by the taxpayer. The degree of control exercised by the taxpayer was substantially the same as would be expected if the contractors had been admitted employees, paid by the piece. Piecework in itself makes pointless much of the control which normally would be exercised over employees paid by the hour. It is significant, however, that where the interests of the taxpayer were involved, the findings disclose that control was exercised. However the facts are weighed, they will not support a conclusion that the persons in question were not, as a matter of economic reality, dependent upon the taxpayer's business as their means of livelihood. Since the facts in the instant case and in the case of Rutherford v. McComb[8] do not appear to be distinguishable in any material degree, we think a corresponding result should be reached. There is no rule of thumb that defines precisely the relationship between the employer and the em-

9 Cir., 148 F.2d 655; Grace v. Magruder, 80 U.S.App.D.C. 53, 148 F.2d 679; Nevins, Inc. v. Rothensies, 3 Cir., 151 F.2d 189; United States v. Wholesale Oil Co., 10 Cir., 154 F.2d 745; Greyvan Lines, Inc. v. Harrison, 7 Cir., 156 F.2d 412; Birmingham v. Bartels, 8 Cir., 157 F. 2d 295.

2 Restatement of the Law of Agency, Sec. 220, p. 483.

3 American Oil Co. v. Fly, 5 Cir., 135 F.2d 491, 492, 147 A.L.R. 824.

4 Harrison v. Greyvan Lines, Inc., 331 U.S. 704, 67 S.Ct. 1463; United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463; Rutherford Food Corporation v. Mc-

Comb, 331 U.S. 722, 67 S.Ct. 1473; Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547.

5 Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547.

6 United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463; Rutherford v. McComb, 331 U.S. 722, 67 S.Ct. 1473; National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170.

7 Helvering v. Davis, 301 U.S. 619, 641, 57 S.Ct. 904, 81 L.Ed. 1307, 109 A.L.R. 1319; United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463.

8 331 U.S. 722, 67 S.Ct. 1473.

ployee. Degrees of control, risks of loss, opportunity for profit, investment in facilities, permanency of the relation, and skill in workmanship, all are important for decision. The entire situation controls the decision.[9]

The judgments appealed from are reversed, and the causes remanded for further proceedings not inconsistent with this opinion.

SIBLEY, Circuit Judge (dissenting).

There is nothing in the conclusions of law of the district judge to warrant the inference that he had an erroneous view of the law. He made very clear findings of fact, well warranted by the uncontradicted evidence, and our question is whether those facts require a finding that Bradford, Walker, and Hobbs were each employees of the taxpayer, who were producers, packers and marketers of citrus fruits in Orange County, Florida, in 1937, 1938 and 1939.

They were not hired by the day, week or month, and at no fixed wage. In the citrus fruit business since 1928 it has been the custom at the beginning of the packing season, which lasts only three or four months, to receive bids from persons desiring to contract for the season to construct the boxes, which are shipped to a packing house knocked down, and to label and load them into cars after they are packed, for so much per hundred boxes. This custom antedated the social security laws, and was not an effort to circumvent them. Bradford, Walker and Hobbs were the low bidders at taxpayers' packing house, and received contracts for all or a part of these jobs in the above named shipping seasons. They could not by themselves execute the work each had contracted for, but each hired other men to aid in the work or to do it all, as they desired, the taxpayers having nothing to do with the hiring, control or discharge of them, and paying them no wages and owing them none. When eight or more were used by a contractor, he recognized that he was an employer under the social security laws and paid his and their social security taxes accordingly. The packing house had no legal relation to these workmen except, being the owner of the portion of the premises assigned for doing this work, it was bound to see that the premises were reasonably safe. Bradford, Walker, and Hobbs paid the wages of their several workmen, less their taxes, out of what they received in the weekly settlements for boxes made or loaded under their respective contracts; they paid their own taxes, and what was left was the season's profit.

The taxes in dispute, however, were assessed on all that was paid Bradford, Walker and Hobbs, although the greater part of it went to their workmen and some of it went for social security taxes due by Bradford, Walker, and Hobbs as being themselves employers. It seems to me unjust and self-contradictory to say these three men are employees and what is paid them is taxable wages, and at the same time to say they are employers and as such owe taxes on the greater part of what was paid them. This fact of their being bona fide employers of others on their own account and not as agents of the plaintiffs here is what distinguishes this case from those recently decided by the Supreme Court.

It is true that they did not offer to serve others after they had contracted for the season. That would be true of any contractor so long as a job lasted which took all his time. But they worked for others and farmed between packing seasons. They used the premises and tools and materials of the taxpayers in executing the contracts, but so they might have done if they had contracted to build houses instead of boxes. The United States during the war furnished premises, tools, and materials to build ships at so much per ship, with no possibility of loss to the builder, but the idea that the builder was not an independent contractor we did not approve. St. Johns River Shipbuilding Co. v. Adams et al., 164 F.2d 1012. While the contractors here in question were not capitalists, a contract for 400,000 boxes, at $1.35 per hundred as paid Hobbs the last season, would come to $5,400, a very substantial sum. They were free men and entitled to work as contractors and employers of others if they

---

[9] Schwing v. United States and William H. Wanamaker, Inc. v. United States, 3 Cir. 1948, 165 F.2d 518.

desired. Nobody treated them as mere employees. The Supreme Court of Florida held Hobbs was not such in Gentile Bros. Co. v. Florida Industrial Commission, 151 Fla. 857, 10 So.2d 568, under a statute modeled on the federal Act. These taxpayers deducted nothing for social security taxes from what was paid them; and the United States collected such taxes from them as employers, including deductions from wages due their respective workmen. I think that Bradford, Walker and Hobbs not only could be found to be independent contractors, but that they ought to be.