United States Court of Appeals,

Eleventh Circuit.

No. 95-4292.

Immacula ANTENOR, et al., Plaintiffs-Appellants,

Ysnel OSNEL, Plaintiff,

v.

D & S FARMS;  Iori Farms, Inc.;  Virgil S. Gil Turke, a/k/a
Virgil Banciu;  AG-Tech Services, Inc., Defendants-Appellees.

July 19, 1996.

Appeal from the United States District Court for the Southern
District of Florida. (No. 90-868-CIV-DLG), Donald L. Graham, Judge.

Before CARNES and BARKETT, Circuit Judges, and DYER, Senior Circuit
Judge.

BARKETT, Circuit Judge:

Immacula Antenor and 610 other seasonal agricultural workers
("farmworkers" or "pickers") appeal from a summary judgment in
favor of D & S Farms and Iori Farms, Inc. ("growers") on their
claims under the Migrant and Seasonal Agricultural Worker
Protection Act and the Fair Labor Standards Act. [1]  The district
court granted the judgment after concluding that the farmworkers
presented insufficient evidence that they were "employed" by the
growers under these statutes.  Upon *de novo* review of the record,
we find substantial evidence that the growers, along with a labor
contractor, were "joint employers" of the farmworkers.
Accordingly, we reverse the summary judgment and remand for
proceedings consistent with this opinion.

---

[1]*See* Migrant and Seasonal Agricultural Worker Protection
Act, 29 U.S.C. §§ 1801-72 (1994);  Fair Labor Standards Act, 29
U.S.C. §§ 201-19 (1994).

## I. FACTUAL BACKGROUND

The facts relevant to the existence of an employment relationship between the growers and pickers can be summarized as follows.[2]  In the mid-1980s, the growers began producing snap beans for fresh market sale.  In search of a steady supply of labor to pick the beans, the growers turned to Virgil Turke, owner and operator of Ag-Tech Services, Inc. ("Ag-Tech"), a labor contracting business.  The growers and Turke agreed that he would assume responsibility for hiring, furnishing and paying the pickers, and that he would be paid $3.90 per box of beans.  The farmworkers were among the people hired by Turke to pick the growers' crops between 1986 and 1989.

Based on planting schedules and market demand, the growers decided when to harvest a particular bean field.  After selecting a field, they told Turke its location and the number of workers needed.  Turke then arranged for subcontractors to recruit and hire pickers.  After arriving at a field, the pickers were assigned rows by Turke and his subcontractors.  They could not begin picking, however, until the growers and their onsite foremen gave the command to start work, because it was essential, for commercial reasons, that picking not begin until the morning dew had lifted from the beans.  The pickers filled the boxes that were brought to the field by the growers and distributed by Turke and the subcontractors.  As the pickers filled the initial allotment of

---

[2]Because we are reviewing a summary judgment in the growers' favor, we view the evidence and all reasonable inferences therefrom in the light most favorable to the farmworkers. *Parks v. City of Warner Robins, GA,* 43 F.3d 609, 612-13 (11th Cir.1995).

boxes, they walked to the growers' field trucks, where one of the growers' employees gave them additional boxes.

Two sets of supervisors, also known as "field walkers," oversaw the pickers' work. One set was hired by Turke and the other set was hired by the growers. Both sets of field walkers passed through the rows of beans, checking the work of individual pickers and, when work was found to be deficient, spoke directly to the picker to ensure that corrective steps were taken; the growers' field walkers also complained about deficient work to Turke and his subcontractors.

The subcontractors' assistants carried full boxes to the growers' trucks, where they were weighed and closed by the subcontractors or their assistants. The growers' field walkers then loaded the boxes on trucks and drove them to the growers' packing facility. As the day progressed, more and more of the growers' field walkers' time was absorbed in stacking and loading boxes, with a corresponding decrease in the time devoted to supervision of individual bean pickers.

Work normally concluded when the pickers completed the rows assigned to Turke by the growers. On some occasions, however, the growers decided the crew would work longer or shorter hours, depending on their harvest needs. If the growers decided, for example, to halt picking to avoid overloading their packing and storage facilities, their field walkers went to the field and removed the picking buckets from the pickers' hands.

The growers' payment to Turke was based on the number of boxes of beans delivered to the packinghouse. Although the price was to

be $3.90 per box, the actual payment was less. Because Turke was financially unable to purchase worker's compensation insurance for the farmworkers, the growers withheld 11¢ per box from his compensation to purchase a worker's compensation policy, which named the growers as the insured parties and employers of the farmworkers. The growers also computed social security taxes due on the workers and issued Turke two checks—one for the taxes and another for the agreed upon price per box less the social security taxes and the 11¢ per box for worker's compensation insurance. From his payment, Turke paid the subcontractors a set amount for each box picked by their workers, which varied depending on whether the subcontractor provided transportation to the farmworkers. The subcontractors then paid the farmworkers their wages.

## II. PROCEDURAL BACKGROUND

The farmworkers filed suit against the growers, Turke and Ag-Tech under the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801-72 (1994) ("AWPA"), and the Fair Labor Standards Act, 29 U.S.C. §§ 201-19 (1994) ("FLSA"). [3] Their complaint alleged that the growers, Turke and Ag-Tech violated the AWPA by failing to keep hourly records, to pay unemployment compensation and social security taxes, and to pay wages promptly when due, *id.* §§ 1831(c)(1), (2) & 1832(a), (c). The farmworkers alleged that the growers also violated the AWPA by using labor

---

[3]We use the abbreviation "AWPA" to refer to the Migrant and Seasonal Agricultural Worker Protection Act. The Act is also occasionally referred to as the "MSPA" or the "MSAWPA." We employ "AWPA" because it is the acronym utilized by the United States Supreme Court in its only opinion interpreting the Act. *Adams Fruit Co., Inc. v. Barrett,* 494 U.S. 638, 640, 110 S.Ct. 1384, 1386, 108 L.Ed.2d 585 (1990).

contractors to recruit and transport them without reasonably ensuring that the contractors were registered and insured, *id.* §§ 1841(b)(1)(C) & 1842. The farmworkers claimed that defendants violated the FLSA by failing to keep hourly records and pay minimum wage, *id.* §§ 206(a), 211(c). Defaults were entered against Turke and Ag-Tech for failure to file responsive pleadings.

Following discovery, the parties filed cross motions for summary judgment on the growers' liability under the FLSA and the AWPA. The farmworkers argued that the growers were liable because they, along with Turke and Ag-Tech, were "joint employers" of the farmworkers. The growers contended that they were not liable because Turke was the farmworkers' sole employer. The district court granted summary judgment to the growers and denied summary judgment to the farmworkers, finding that there were no genuine issues of material fact and that the growers were entitled to judgment as a matter of law. *See Antenor v. D & S Farms, Inc.,* 866 F.Supp. 1389 (S.D.Fla.1994).

### III. DISCUSSION

A determination of employment status under the FLSA and the AWPA is a question of law subject to our *de novo* review. *Aimable v. Long & Scott Farms, Inc.,* 20 F.3d 434, 440 (11th Cir.), *cert. denied,* --- U.S. ----, 115 S.Ct. 351, 130 L.Ed.2d 306 (1994). Because we are reviewing a summary judgment in favor of the growers, we must determine whether there are genuine issues of material fact and, if not, whether the growers are entitled to judgment on the question of joint employment as a matter of law; stated differently, we must determine whether the evidence and all

reasonable inferences therefrom, viewed in the light most favorable to the pickers, support a reasonable conclusion that they were employed by the growers for purposes of the AWPA and the FLSA. *See Parks v. City of Warner Robins, GA,* 43 F.3d 609, 612-13 (11th Cir.1995). To do this, we initially consider the statutory definition of "employ" under the FLSA and AWPA and their legislative history.

## A. Statutory Background

The FLSA was enacted in 1938 in order to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers...." 29 U.S.C. § 202(a), (b). It requires that employers, among other things, keep payroll records and pay employees a minimum hourly wage and overtime. *Id.* §§ 201-11. The AWPA, enacted in 1983, was intended "to assure necessary protections for migrant and seasonal agricultural workers...." *Id.* § 1801. Among its provisions, the AWPA requires agricultural employers to register with the government, maintain employment records for workers, and comply with various compensation, housing and transportation provisions. *Id.* §§ 1811-44.

The growers' liability under the FLSA and the AWPA depends on whether they "employed" the farmworkers furnished by Turke. *See id.* § 203(d), (e)(1); *id.* § 1802(2). Both statutes utilize the same definition of "employ," so if the growers employed the farmworkers under one statute, they necessarily employed them under the other. *Aimable,* 20 F.3d at 440. In defining "employment" under both statutes, Congress expressly rejected the common-law

definition of employment, which is based on limiting concepts of control and supervision. *See Walling v. Portland Terminal Co.,* 330 U.S. 148, 150-51, 67 S.Ct. 639, 640-41, 91 L.Ed. 809 (1947); *Aimable,* 20 F.3d at 439.[4]   Rather, an entity "employs" a person under the FLSA and the AWPA if it "suffers or permits" the individual to work.  29 U.S.C. § 203(g);   *id.* § 1802(5).[5]   An entity "suffers or permits" an individual to work if, as a matter of economic reality, the individual is dependent on the entity. *Goldberg v. Whitaker House Cooperative, Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 936-37, 6 L.Ed.2d 100 (1961);  *Aimable,* 20 F.3d at 439.

To assure protection for workers, both statutory schemes make it clear that a worker can be economically dependent on, and thus jointly employed by, more than one entity at the same time.  *See* 29 C.F.R. § 791.2;  *id.* § 500.20(h)(4).  Thus, the AWPA and the FLSA specifically cover "joint employment" relationships.   The AWPA regulations define "joint employment" as follows:

> The term *joint employment* means a condition in which a single individual stands in the relation of an employee to two or more persons at the same time.  A determination of whether the

---

[4]*See also* H.R.Rep. No. 97-885, 97th Cong., 2d Sess. (1982) 6-8 *reprinted in* 1982 U.S.C.C.A.N. 4547, 4552-54 (declaring intent that terms "employee," "employer" and "independent contractor" used in AWPA "not be construed in their limited common law sense").

[5]The "suffer or permit to work" standard derives from state child-labor laws designed to reach businesses that used middlemen to illegally hire and supervise children.  *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 728 n. 7, 67 S.Ct. 1473, 1476 n. 7, 91 L.Ed. 1772 (1947);  *People ex rel. Price v. Sheffield Farms-Slawson-Decker Co.,* 225 N.Y. 25, 121 N.E. 474, 476 (1918).  It has been called " "the broadest definition [of employee] that has ever been included in one act.' "  *United States v. Rosenwasser,* 323 U.S. 360, 363 n. 3, 65 S.Ct. 295, 297 n. 3, 89 L.Ed. 301 (1945) (quoting 81 Cong.Rec. 7,657 (1938) (statement of Sen. Hugo Black)).

employment is to be considered joint employment depends upon all the facts in the particular case.  If the facts establish that two or more persons are completely disassociated with respect to the employment of a particular employee, a *joint employment* situation does not exist.

*Id.* § 500.20(h)(4)(i);  *see also id.* § 791.2.[6]

The AWPA's adoption of the FLSA definition of employment "was

---

[6]The regulations also provide a means for the Secretary of Labor to determine whether a joint employment relationship exists:

Questions will often arise under the Act as to whether individuals employed by a farm labor contractor are also jointly employed by another person engaged in agriculture (including any person defined in the Act as an agricultural employer or an agricultural association).  Such joint employment relationships are common in agriculture and have often been addressed by the Federal courts.  *See ... Hodgson v. Griffin and Brand,* 471 F.2d 235 [ (5th Cir.1973) ], ... *Rutherford Food Corporation v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 [ (1947) ], ... and *Usery v. Pilgrim Equipment Company, Inc.,* 527 F.2d 1308 [ (5th Cir.1976) ].  In determining whether such a joint employment relation exists the courts have cited the broad definition of *employ* in the [FLSA] which *includes to suffer or permit to work.*  The factors considered significant by the courts in these cases and to be used as guidance by the Secretary, include, but are not limited to, the following:

(A) The nature and degree of control of the workers;

(B) The degree of supervision, direct or indirect, of the work;

(C) The power to determine the pay rates or the methods of payment of the workers;

(D) The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers;

(E) Preparation of payroll and the payment of wages.

29 C.F.R. § 500.20(h)(4)(ii);  *see also id.* § 791.2 (1992) (defining "joint employment" under FLSA).

deliberate and done with the clear intent of adopting the "joint employer' doctrine as a central foundation of this new statute; it is the indivisible hinge between certain important duties imposed for the protection of migrant and seasonal workers and those liable for any breach of these duties." H.R.Rep. No. 97-885, 97th Cong., 2d Sess. (1982) 6, *reprinted in* 1982 U.S.C.C.A.N. 4547, 4552 ("House Report"). Previous legislative efforts to protect farmworkers had focused on regulating the crewleaders who recruited, managed and paid the farmworkers. *Id.* at 4547-48. Those efforts, however, had failed to "reverse the historical pattern of abuse of migrant and seasonal farmworkers," *id.* at 4549, primarily because crew leaders were transient and often insolvent, *id.* at 4548. Thus, in designing the AWPA, Congress took "a completely new approach," *id.* at 4549, making agricultural entities directly responsible for farmworkers who, as a matter of economic reality, depended upon them, even if the workers were hired or employed by a middleman or independent contractor, *id.* at 4553-54. Although the AWPA places responsibilities on farm labor contractors as well as on agricultural employers, *see* 29 U.S.C. §§ 1811-44, "Congress' plain intent was to protect migrant and seasonal workers from abuse and exploitation, and to hold "agricultural employers' fully accountable as joint employers whenever the facts suggest that liability is fairly imposed." *Maldonado v. Lucca,* 629 F.Supp. 483, 489 (D.N.J.1986).

## B. Applicable Caselaw

In addition to the legislation, we are guided by a Supreme Court case and three Eleventh Circuit cases that have addressed the

statutory definition of employment based upon economic dependence. In *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947), the Secretary of Labor sued a slaughterhouse operator for FLSA violations arising from its treatment of "boners," who deboned meat. *Id.* at 723-24, 67 S.Ct. at 1473-74. The operator asserted that it did not "employ" the boners because they were recruited, hired and supervised by a labor contractor who, according to a contract with the operator, was to have "complete control" over the boners. *Id.* at 724-25, 67 S.Ct. at 1474. The Supreme Court held that the "determination of the relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity." *Id.* at 730, 67 S.Ct. at 1477. In determining whether the operator suffered or permitted the boners to work, the Court emphasized that the boners were "part of the integrated unit of production," *id.* at 729, 67 S.Ct. at 1476, because the deboning occurred in the middle of the process of slaughtering the cattle, preparing the meat for deboning, packing it and shipping it, all of which was performed by slaughterhouse employees, *id.* at 726, 67 S.Ct. at 1475. The Court also noted that the slaughterhouse, and not the contractor, owned the premises and deboning equipment, and that the work, though skilled, "was more like piecework." *Id.* at 730, 67 S.Ct. at 1477. "Upon the whole," the Court determined that the slaughterhouse employed the deboners for purposes of the FLSA. *Id.* at 730, 67 S.Ct. at 1477.

A year later the former Fifth Circuit[7] decided *Fahs v. Tree-Gold Co-operative Growers of Florida, Inc.,* 166 F.2d 40 (5th Cir.1948).[8] A citrus-packinghouse operator employed labor contractors to furnish workers to assemble, label, close and load the boxes in which the citrus fruit was packed. *Id.* at 42-43. The labor contractors were responsible for hiring, firing and supervising their crew members, and establishing their hours and wages. *Id.* at 43. The contractors, who were paid based on the number of boxes handled by their workers, paid their own crew workers. *Id.* The packinghouse operator maintained worker's compensation insurance to cover the workers. *Id.* at 42. The court concluded that the crew workers, as well as the contractors, were sufficiently dependent on the packinghouse to be considered its employees. *Id.* at 43-45. Looking beyond the formalities of who paid and supervised the workers, the court emphasized that the contractors and crewmembers' services "constituted a part of an integrated economic unit" controlled by the packinghouse operator; that the premises and all significant investment in tools and facilities were provided by the packinghouse; and that although the packinghouse did not directly control the workers, it asserted control whenever its interests were involved. *Id.* at 44-45.

In *Hodgson v. Griffin & Brand of McAllen, Inc.,* 471 F.2d 235

---

[7]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), we held that all decisions of the former Fifth Circuit handed down before October 1, 1981, are binding in this court.

[8]Although *Fahs* was a social security case, it is relevant because it was decided at a time when employment relationships for social security purposes were analyzed under the same legal test as the FLSA. *See Bartels v. Birmingham,* 332 U.S. 126, 130, 67 S.Ct. 1547, 1549-50, 91 L.Ed. 1947 (1947).

(5th Cir.), *cert. denied,* 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973), the Secretary of Labor sued a grower for FLSA violations related to its use of harvest workers supplied by labor contractors. *Id.* at 235-36. The growers argued that the labor contractors were the harvest workers' sole employers. *Id.* at 237. The evidence showed that the contractors hired the pickers, drove them to the fields, directly supervised them and paid them their earnings. *Id.* at 236-37. The evidence also showed, however, that the work occurred on the grower's premises and that the grower's foreman decided daily starting times, made field assignments, oversaw the work, told contractors of problems with the workers' performances and what to pay the workers, and assisted the labor contractors in paying social security taxes. *Id.* at 236-37. Whether the grower was a joint employer of harvest workers, the court explained, "does not depend on technical or isolated factors" or on "the form of the relationship," *id.* at 237 (quotation omitted); instead, "it depends ... on the economic reality" of the "circumstances of the whole activity," *id.* Given the "total work arrangement," the court determined that the grower, along with the contractors, jointly employed the workers and thus was subject to the FLSA. *Id.* at 238. In enacting the AWPA, Congress expressly recognized that *Griffin & Brand* "summarizes the proper approach and the appropriate criteria to be used in making [joint employer] determinations." *See* House Report at 4553.

We most recently considered agricultural joint employment relationships in *Aimable v. Long & Scott Farms, Inc.,* 20 F.3d 434 (11th Cir.), *cert. denied,* --- U.S. ----, 115 S.Ct. 351, 130

L.Ed.2d 306 (1994), which involved claims under both the AWPA and the FLSA.  A group of migrant and seasonal agricultural workers sued a farm labor contractor and the grower on whose fields they worked, claiming that the two jointly employed them.  *Id.* at 437. Unlike in *Griffin & Brand,* virtually all direct supervision of the workers in *Aimable* was performed by the contractor, who also had the sole power to hire or fire the harvest workers and "exercised absolute, unfettered, and sole control over [the workers] and their employment."  *Aimable,* 20 F.3d at 440-41.  The labor contractor in *Aimable* also handled all payroll responsibilities, determined the crew's wage rates, and "made significant investments in equipment and facilities."  *Id.* at 440-43.  Under these circumstances, we concluded that the farmworkers were not economically dependent on and therefore were not "employed" by the grower.  *Id.* at 445.

C. Determining Joint Employment Status

In *Aimable,* this court recognized at least eight factors that can be analyzed to determine whether a farmworker furnished by a labor contractor was economically dependent on, and therefore jointly employed by, a grower:  (1) the nature and degree of the grower's control of the farmworkers;  (2) the degree of the grower's supervision, direct or indirect, of the farmworkers' work; (3) the grower's right, directly or indirectly, to hire, fire, or modify the farmworkers' employment conditions;  (4) the grower's power to determine the workers' pay rates or methods of payment; (5) the grower's preparation of payroll and payment of the workers' wages;  (6) the grower's ownership of the facilities where the work occurred;  (7) the farmworkers' performance of a line-job integral

to the harvesting and production of salable vegetables; and (8) the grower's and labor contractor's relative investment in equipment and facilities. *Id.* at 440-46.[9]

In applying these factors, we are guided by several principles. First, the question in "joint employment" cases is not whether the worker is more economically dependent on the independent contractor or the grower, with the winner avoiding responsibility as an employer. As the term "joint employment" suggests, the AWPA "envisions situations where a single employee may have the necessary employment relationship with not only one employer but simultaneously such a relationship with an employer and an independent contractor." House Report at 4553. Thus, rather than comparing the employment relationships in order to exclude one, "[t]he focus of each inquiry ... must be on each employment relationship as it exists between the worker and the party asserted to be a joint employer." *Id.* at 4553-54.

Second, no one factor is determinative. *Rutherford Food Corp.,* 331 U.S. at 730, 67 S.Ct. at 1477. As we explained in *Aimable,* the existence of a joint employment relationship depends on "the "economic reality' of *all the circumstances."* *Aimable,* 20 F.3d at 439 (emphasis added); *see* 29 C.F.R. § 500.20(h)(4)(i)

_____

[9]The first five factors come from DOL regulations. *See supra* note 6. The sixth, seventh and eighth factors come from caselaw. *See Aimable,* 20 F.3d at 443-45. In *Aimable,* the court acknowledged that three additional factors—the farmworker's opportunity for profit and loss, the permanency and exclusivity of the employment, and the degree of skill required to perform the farmworker's job—ordinarily are relevant only where the question is whether the workers are independent contractors or employees, and not where the question is whether the farmworkers are employed solely by the contractor or jointly by the contractor and the farmer. *Id.*

(providing that "determination of whether the employment is to be considered joint employment depends upon *all the facts* in the particular case") (emphasis added).

Third, the factors are used because they are indicators of economic dependence. *See Aimable,* 20 F.3d at 439. They are "aids-tools to be used to gauge the degree of dependence of alleged employees on the business to which they are connected. It is *dependence* that indicates employee status. Each [factor] must be applied with that ultimate notion in mind." *Usery v. Pilgrim Equipment Co., Inc.,* 527 F.2d 1308, 1311 (5th Cir.), *cert. denied,* 429 U.S. 826, 97 S.Ct. 82, 50 L.Ed.2d 89 (1976). Thus, the weight of each factor depends on the light it sheds on the farmworkers' economic dependence (or lack thereof) on the alleged employer, which in turn depends on the facts of the case, *see Aimable,* 20 F.3d at 440.

Fourth, a joint employment relationship is not determined by a mathematical formula. "[T]he absence of evidence on any one or more of the criteria listed does not preclude a finding that an ... agricultural employer was a joint employer along with the crewleader." House Report at 4553. The purpose of weighing the factors is not to place each in either the contractor or the grower's column, but to view them qualitatively to assess the evidence of economic dependence, which may point to both. *See Usery,* 527 F.2d at 1311 (explaining that "the collective answers to all of the inquiries [cannot] produce a resolution which submerges consideration of the dominant factor—economic dependence").

Fifth, in considering a joint-employment relationship, we

must not allow common-law concepts of employment to district our focus from economic dependency. *See Aimable,* 20 F.3d at 439; House Report at 4553. Indeed, the "suffer or permit to work" standard was developed to assign responsibility to businesses that did not directly supervise putative employees. *See Rutherford Food Corp.,* 331 U.S. at 728 & n. 7, 67 S.Ct. at 1476 & n. 7; *People ex rel. Price v. Sheffield Farms-Slawson-Decker Co.,* 225 N.Y. 25, 121 N.E. 474, 476 (1918). Thus, our inquiry looks "not to the common law definitions of [employer and employee] (for instance, to tests measuring the amount of control an ostensible employer exercised over a putative employee), but rather to the "economic reality' of all the circumstances concerning whether the putative employee is economically dependent upon the alleged employer." *Aimable,* 20 F.3d at 439.[10]

Finally, because the FLSA and AWPA are remedial statutes, we must construe them broadly. *See A.H. Phillips, Inc. v. Walling,* 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945) (recognizing that FLSA must be interpreted broadly to effectuate its "humanitarian and remedial" purpose); *Caro-Galvan v. Curtis Richardson, Inc.,* 993 F.2d 1500, 1505 (11th Cir.1993) (stating that

---

[10]Thus, courts have found economic dependence under a multitude of circumstances where the alleged employer exercised little or no control or supervision over the putative employees. *See, e.g., Castillo v. Givens,* 704 F.2d 181, 184 (5th Cir.) (finding dependence where grower visited farm only three or four times per week), *cert. denied,* 464 U.S. 850, 104 S.Ct. 160, 78 L.Ed.2d 147 (1983); *Usery,* 527 F.2d at 1312 (finding dependence where putative employer had "neither the right to hire employees nor the right to set hours"); *Fahs,* 166 F.2d at 43 (finding dependence where business had no right to control number of employees, wages or hours); *Alviso-Medrano v. Harloff,* 868 F.Supp. 1367, 1372 (M.D.Fla.1994) (finding employment relationship where no direct oversight by grower).

"[b]road construction of the [AWPA] comports with [its] humanitarian purpose to protect all those hired by middlemen to toil in our nation's fields, vineyards and orchards") (quotation omitted).

### D. Application of Factors to this Case

With these principles in mind, we turn to the evidence in this case. Although we initially consider the factors separately, we ultimately weigh them collectively and qualitatively to determine whether the pickers, notwithstanding any employment relationship with the contractor,[11] were economically dependent on, and therefore jointly employed by, the growers under the FLSA and AWPA.

### 1. Nature and degree of control of workers

The first indicia of joint employment status concerns the "nature and degree of [the growers'] control of the workers." 29 C.F.R. § 500.20(h)(4)(ii)(A). Such control arises when a grower determines, for example, the number of workers hired for a job, when work should begin on a particular day, which workers should be assigned to specific tasks, and whether a worker should be disciplined or retained. *Aimable,* 20 F.3d at 441. As noted earlier, the suffer or permit to work/economic dependence standard defines employment in a way that does *not* depend on the common-law understanding of employment, which was based on limiting concepts of control. *See id.* at 439. Nevertheless, a grower's control of farmworkers does shed some light on economic dependence.

---

[11]The parties do not dispute that Turke and Ag-Tech were employers of the farmworkers.

The evidence indicates that the growers exercised control over the farmworkers in several ways.  First, the growers told Turke how many farmworkers to bring each day.[12]  Second, the growers' foremen, rather than Turke, determined the precise moment when picking would commence each day.  Third, the growers were free to directly delay or stop the workers from continuing their work.  For example, when new immigration laws that required increased worker documentation went into effect, the growers stopped the harvest to verify that Turke and his workers were in compliance with the laws, and they did not allow work to resume until Turke demonstrated their compliance the following day.[13]  Finally, the growers had the

---

[12]Turke testified in deposition as follows:

> Q. And during the '85-'86 harvest season, again isolating on D & S Farms, you learned of the harvest needs through telephone contact from [D & S Farms' manager]?
>
> A. Correct.  He would call.
>
> Q. He would call?
>
> A. Right.  He would tell me how many rows.  He would tell me where the field was and how many people he'd like to have.

[13]Turke testified as follows about the incident:

> A. [O]ne morning I went to the field and I was told that I had to get my pickers out of the field because they had no ID cards.
>
> Q. Who told you that?
>
> A. This came down from one of the people that worked for both farms.  We were picking for both farms that day, I remember that much, and we were stopped and our people were told to leave the field because we didn't have IDs.
>
> Q. And you were told by some representative of each of the farms that your crew was to stop working?

ability indirectly to assign work to specific workers. During the 1986-87 season, for example, they moved the pickers from one row to another and from one plot to another by assigning their own tomato-picking crews to pick plots and rows that were being picked by the farmworkers. *Compare Griffin & Brand,* 471 F.2d at 237-38 (finding that farmer exercised a "degree of apparent on-the-job control" over workers by "tell[ing] the crewleaders at what hour to

---

A. To stop working because they had no ID cards from the South Florida Vegetable Association.

Q. And so did your crew, in fact, stop work?

A. They did, and they went down there, lined up to try and get ID cards so they could come back and finish the job.

In the meantime, I went to my office and brought back a copy of the law that said the ID card was not necessary and they could not force the people to have an ID card, because they wanted to charge the people $7.50, I believe, for the ID cards.

And I told [the growers]. I said, "Look," I said, "I'm making ID cards for free for these guys." I said, "I'm charging three dollars, but it takes me three dollars just to get an ID card done." I said, "I'm not trying to make a nickel out of this thing." I said, "These guys are just in it trying to make some money."

And then I showed them the law and I showed them my card and I showed them the—you know, the documentation that we had behind our cards and, you know, basically the same thing that [the South Florida Vegetable Association representative] had. Now, ours were not as elaborate as his, but they did the job.

Q. Right. And so you had this conversation with [the growers]?

A. Right, and I showed them the law.

Q. And what did they say after you spoke with them?

A. Told me to put my people back to work.

begin work") *with Aimable,* 20 F.3d at 440-41 (concluding that contractor had "absolute, unfettered, and sole control" over farmworkers).

### 2. Degree of supervision of the work

The second factor bearing on joint-employment status is the "degree of supervision [by the grower], direct or indirect, of the work." 29 C.F.R. § 500.20(h)(4)(ii)(B). Somewhat similar to the previous factor, such supervision includes overseeing the pickers' work and providing direction. *Aimable,* 20 F.3d at 441. This factor, like the growers' control over the workers, has more to do with common-law employment concepts of control than with economic dependence. Indeed, the "suffer or permit to work" standard was developed in large part to assign responsibility to businesses which did *not* directly supervise the activities of putative employees. *Rutherford Food Corp.,* 331 U.S. at 728 & n. 7, 67 S.Ct. at 1476 & n. 7; *Sheffield Farms-Slawson-Decker Co.,* 121 N.E. at 476. Nevertheless, a grower's supervision of farmworkers, like a grower's control of them, provides some guidance to our inquiry.

In considering this factor, "special aspects of agricultural employment [must] be kept in mind." House Report at 4554. When unskilled labor is utilized in an agricultural setting, for example, the grower is not expected to look over the shoulder of each farmworker every hour of every day. Thus, "[i]t is well settled that supervision is present whether orders are communicated directly to the laborer or indirectly through the contractor." *Aimable,* 20 F.3d at 441 (citing *Griffin & Brand,* 471 F.2d at 238).

In this case the evidence reflects that the growers supervised

the pickers in substantial ways.  In addition to telling them when picking could begin and distributing the boxes, the growers' field workers directly oversaw and intervened in the pickers' work, both directly and indirectly, on a daily basis.  Turke testified to the growers' oversight and direct intervention as follows:

> Q. And what would these D & S Farms people do?
>
> A. They would walk around and make sure the baskets were full, make sure the quality control was there, no trash in the baskets.  If there was a problem, they'd bring it to our attention.
>
> Q. Did you ever see the D & S Farms employees talk directly to the workers or try to show them what they were doing wrong?
>
> A. Yes.  Yes.
>
> Q. Did that happen very often?
>
> A. Day to day.  They couldn't hardly be out there without it.

Turke also testified that the growers would complain to him "that the job was not going fast enough."

We find this supervision more substantial than the "infrequent assertions of minimal oversight" by the grower in *Aimable,* 20 F.3d at 441, where the grower's employees, "except on rare occasions, left supervision and oversight of [the farmworkers] entirely to [the contractor] and his crew" and "rarely provided any direction to [the farmworkers'] work," *id.*  In contrast to this "de minimis" supervision, *id.,* the growers in the present case oversaw and directly intervened in the pickers' work on a daily basis.  *See Griffin & Brand,* 471 F.2d at 238 (finding joint employment where farmer's field supervisors regularly gave instructions to crew leaders who passed them on to workers); *Haywood v. Barnes,* 109

F.R.D. 568, 590 (E.D.N.C.1986) (finding joint employment based in part on regular supervision).

3. Right to hire, fire, or modify employment conditions

The third indicia of joint employment is the growers' "right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers."  29 C.F.R. § 500.20(h)(4)(ii)(D).  In this case, the evidence indicates that the growers had the power to "veto" Turke's hiring decisions and to modify employment conditions such as the hours the pickers worked.  For example, the growers themselves monitored the workers' job qualifications rather than relying on Turke to do so when they stopped work until they could verify compliance with the new immigration laws.

Additionally, as discussed above, the growers dictated the workers' hours, a condition of employment, by deciding when the work was to begin, by forcing the pickers to stop picking when prices were bad, and, during the '86-'87 season, by sending their own tomato-picking crews into fields assigned to the farmworkers, causing them to run out of work by noon.  *Compare Aimable,* 20 F.3d at 442 (finding no dependence where grower never dictated hours employees could work) *with Griffin & Brand,* 471 F.2d at 237 (finding dependence where business decided daily starting times).

4. Power to determine pay rates or methods of payment

The next factor is the degree to which the putative employer has the "[p]ower to determine the pay rates or the methods of payments of the workers," 29 C.F.R. § 500.20(h)(4)(ii)(C).  In this case, Turke and the growers agreed to the payment of $3.90 per box. However, pay rate refers not only to the amount of compensation to

be paid, but includes benefits such as worker's compensation insurance and social security, as well as how these various payments are allocated. Method of payment refers to the basis upon which a worker is paid, for example, by the hour or by the piece. *See Aimable,* 20 F.3d at 442; *Griffin & Brand,* 471 F.2d at 238.

The growers' power to exercise some control over the workers' pay in this case is evidenced by their deduction of money from their payments to Turke. First, rather than paying Turke the full $3.90 per box of beans harvested, they deducted 11¢ per box to purchase worker's compensation insurance, decided which insurance to buy, and named themselves as the policy holders. Thus, Turke did not solely and independently establish wage rates and other benefits for the workers. Indeed, Turke could not purchase insurance to cover the workers because he lacked the economic wherewithal; in his own words, "[he] didn't have the money to fork up for workman's comp right then and there." Thus, the farmworkers were dependent on the growers to obtain financial compensation for job-related injuries. *See Fahs,* 166 F.2d at 42 (finding dependence where employee covered by business' worker's compensation insurance); *Hamilton v. Shell Oil Co.,* 215 So.2d 21, 22 (Fla. 4th DCA 1968) (holding that "relationship of employer-employee is essential to liability for workmen's compensation benefits"); *cf. Griffin & Brand,* 471 F.2d at 236 (finding dependence where business deducted social security payments from check given to crew leader).

The evidence shows that the growers also deducted money from the negotiated box price to cover social security taxes, giving Turke a separate check for the employer and employees' shares of

these taxes.  The growers segregated the payments to ensure that Turke properly reported and paid the taxes on the farmworkers' labor.  *Cf. Griffin & Brand,* 471 F.2d at 236 (observing that crew leader was "totally incapable of seeing that social security [wa]s paid in behalf of the harvesting crews").  Like the deduction for worker's compensation insurance, the growers' segregation of the social security payments limited Turke's freedom to allocate the money he received for his services.  And just as the workers depended on the growers for worker's compensation coverage, they relied on them to see that the social security payments were made as well.  *Cf. id.* (stating that "[t]he fact that [the business] ... handled the social security contributions for the harvest workers also tend[s] to indicate an employment relationship").[14]

### 5. Preparation of payroll and payment of wages

The next factor, which in this case is interrelated to the determination of pay rates, is the putative employer's involvement in the "[p]reparation of payroll and the payment of wages" to the workers.  29 C.F.R. § 500.20(h)(4)(ii)(E).  This factor is probative of joint employment because of the likelihood that when a business undertakes to help an independent contractor prepare its payroll and pay its wages, it is likely that the contractor lacks economic substance on which the workers can solely depend.

Here, as noted earlier, the growers computed and segregated social security taxes and purchased worker's compensation to cover the workers.  These actions certainly do not demonstrate that Turke

---

[14]After these deductions were made, Turke took his profit and paid the balance to the subcontractors, who deducted their pay and paid the pickers.

was a truly independent employer. On the contrary, they indicate another way in which the farmworkers were economically dependent on the growers. *See Griffin & Brand,* 471 F.2d at 236 (finding dependence where contractors "totally incapable of seeing that social security is paid in behalf of the harvesting crews").

### 6. Ownership of facilities where work occurred

The first non-regulatory factor indicative of an employment relationship in this case is the putative employer's ownership of the facilities where the work occurred. *See Aimable,* 20 F.3d at 444; *see also Rutherford Food Corp.,* 331 U.S. at 730, 67 S.Ct. at 1477; *Griffin & Brand,* 471 F.2d at 238. This element is probative of joint-employment status for the obvious reason that without the land, the worker might not have work, and because a business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors, *see Gulf King Shrimp Co. v. Wirtz,* 407 F.2d 508, 513-14 (5th Cir.1969). We need not dwell on this factor because there is no question that the growers owned the land where all the work was performed.

### 7. Performance of a line-job integral to business

Another non-regulatory indicia of an employment relationship between workers and a grower is the workers' performance of "a line-job integral to the harvesting and production of salable vegetables." *Aimable,* 20 F.3d at 444. This factor is probative of joint employment because a worker who performs a routine task that is a normal and integral phase of the grower's production is likely to be dependent on the grower's overall production process. *See*

*Rutherford Food Corp.,* 331 U.S. at 730, 67 S.Ct. at 1477; *Fahs,* 166 F.2d at 43-44.

The evidence in this case indicates that the pickers performed a routine line-job integral to the growers' business of growing, harvesting and packing snap beans for fresh market sale. Turke and his crew were but one part of an "integrated economic unit" operated by the growers. Because the farmworkers performed a routine task that was a normal and integral part of the growers' bean production process, they were analogous to employees working at a particular position on a larger production line. They were dependent on the growers' overall production process, of which they were one small but indispensable part. *See Rutherford Food Corp.,* 331 U.S. at 729-30, 67 S.Ct. at 1476-77; *Fahs,* 166 F.2d at 43-44.

8. Investment in equipment and facilities

Finally, one must consider the relative degree of investment in equipment and facilities by the independent contractor on the one hand, and the putative employer on the other. *See Rutherford Food Corp.,* 331 U.S. at 730, 67 S.Ct. at 1477; *Ricketts v. Vann,* 32 F.3d 71, 74 (4th Cir.1994). This factor is probative because of the workers' economic dependence on the person who supplies the equipment or facilities.[15]

---

[15]The growers argue that this factor is irrelevant to our inquiry. According to the growers, *Aimable* held that a disparity between the farmer's and the independent contractor's investment in equipment and facilities is relevant only if the issue is whether the contractor is an independent contractor or an alleged employee. We disagree for two reasons. First, although the *Aimable* court noted that relative investment helps determine whether workers are employees or independent contractors, *Aimable,* 20 F.3d at 443, the court stopped short of holding that it never is relevant in joint employment cases. In fact, the court noted that the factor did not aid its joint employment

In this case the growers owned virtually all the equipment and facilities used by the farmworkers: the picking boxes, the lids and wire used to close them, the pallets on which the boxes were placed, and the trucks used to transport the boxes to the packinghouse. Unlike the contractor in *Aimable,* who "made significant investments in equipment and facilities," including trucks, tools and a labor camp, *Aimable,* 20 F.3d at 443, Turke had no equipment or vehicles of his own. Thus, his role was more like that of the contractor in *Rutherford Food Corp.,* who provided no equipment and had no real business organization. *Rutherford Food Corp.,* 331 U.S. at 731, 67 S.Ct. at 1477. Just as the workers in *Rutherford Food Corp.* could not realistically depend on their crew leaders for other work if the slaughterhouse shut down, *id.,* the farmworkers here could not depend on Turke alone for their economic livelihood.

## 9. Consideration of All Factors

When we consider the preceding factors collectively and qualitatively, we conclude that the evidence before the district court indicated that the farmworkers were jointly employed by Turke and the growers under the AWPA and the FLSA. To be sure, many aspects of the relationship demonstrate that the pickers were economically dependent on Turke. Turke hired and assigned pickers

inquiry because both the grower and the labor contractor there had substantial investment in equipment and facilities. *See id.* (recognizing labor contractor's "significant investments in equipment and facilities," including trucks, tools and labor camp). Second, the Supreme Court has recognized that this factor is relevant to a worker's dependence on a putative employer. *See Rutherford Food Corp.,* 331 U.S. at 731, 67 S.Ct. at 1477; *see also Ricketts,* 32 F.3d at 74. We therefore consider it.

to particular fields; he directly supervised their work; he negotiated the price per box; he fired and disciplined workers; and he paid the workers' wages. At the same time, however, significant aspects of the relationship evidence the pickers' economic dependence on the growers as well. The growers exercised a measure of control in terms of the numbers of pickers needed and the specific hours of work. They exercised a measure of supervision and directly intervened in their work process. They involved themselves in the payroll process and in making provision for social security and workers compensation insurance when the labor contractor was too financially unstable to do so. The growers owned the facilities and controlled the overall production scheme in which the pickers performed an integral line job; and the growers, unlike Turke, had substantial investment in equipment and facilities that were necessary for the pickers' work.

The totality of the evidence before the district court at summary judgment demonstrates the economic dependence of the pickers on both Turke and the growers. Such joint economic dependence was expressly contemplated by Congress when it adopted the "joint employer" doctrine as the best means to ensure that the remedial purposes of the AWPA would be fulfilled. Thus, the district court erred in concluding that the farmworkers were not employees of the growers for purposes of the FLSA and the AWPA.

IV. CONCLUSION

In light of the foregoing, the judgment granting summary judgment to the growers is REVERSED and the case is REMANDED for proceedings consistent with this opinion.

*    *    *    *    *    *