[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 5, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-12171
_____

D. C. Docket No. 00-00034 CV-4RV-SMN

APOLINAR MARTINEZ-MENDOZA,
ELISEO MORALES-CABALLERO, et al.,

Plaintiffs-Appellants,

FRANCISCO PEREZ-DELGADO,
DELFINO CAMACHO-LUNA, et.al.,

Plaintiffs,

versus

CHAMPION INTERNATIONAL CORPORATION,

Defendant-Appellee,

F & K ENTERPRISES,
ELLER & SONS, et. al.,

Third-Party Defendants.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(August 5, 2003)**

Before TJOFLAT and BLACK, Circuit Judges, and NANGLE*, District Judge.

_____

* Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri, sitting by designation.

TJOFLAT, Circuit Judge:

In this case, six migrant employees of a farm labor contractor, suing on behalf of themselves and other migrant workers under the Fair Labor Standards Act, 29 U.S.C. §§ 201-21,[1] and the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801-72,[2] seek the monetary relief granted by the provisions of those acts from a manufacturer of paper products who hired the contractor to plant tree seedlings in the manufacturer's forests. According to these employees,[3] the manufacturer and the farm labor contractor were "joint employers" and therefore liable for such relief. On cross-motions for summary judgment, the district court held that the manufacturer was not a joint employer. Then, without determining whether the case could proceed as a class action, the court entered a final judgment for the manufacturer. Plaintiffs now appeal. In

---

[1] The relevant part of the Fair Labor Standards Act, 29 U.S.C. § 216(b), provides that "[a]n action to recover [unpaid minimum wages or overtime compensation] may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."

[2] The relevant part of the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1854, in subsection (a), authorizes "[a]ny person aggrieved by a violation of" the act to file suit in a United States district court. Subsection (c) authorizes the court to award "damages up to and including an amount equal to the amount of actual damages, or statutory damages of up to $500 per plaintiff per violation, or other equitable relief." If the court certifies the suit as a class action, the court "shall award no more than the lesser of up to $500 per plaintiff per violation, or up to $500,000 or other equitable relief."

[3] For ease of discussion, we refer to the six migrant employees as "named plaintiffs" or "plaintiffs."

2

addition to contending that the district court should have granted their motion for summary judgment on the joint employer issue, they ask that the case be remanded with the instruction that the district court consider whether the case should proceed as a class action on behalf of the class plaintiffs. We affirm the district court's determination that the manufacturer was not plaintiffs' joint employer. Concluding, however, that the court erred in refusing to address the class action issues the case presented, we remand the case for further consideration of those issues.

I.

A.

The manufacturer in this case is Champion International Corporation ("Champion"), formerly a leading producer of paper products in the United States.[4] As part of its operations, Champion maintained approximately five million acres of forest land.[5] After harvesting, it regenerated its forests through a combination of machine and hand planting.[6] Farm labor contractors ("FLCs"), who were registered

---

[4] Champion merged into International Paper Corporation in 2000.

[5] While the record is not clear, we assume that Champion either owned or leased such acreage. We refer to such acreage as if Champion owned it.

[6] Champion also naturally regenerated parts of its harvested forests.

with the United States Department of Labor, provided Champion with the laborers for the hand planting.[7] Between 1996 and 1999 – the time period during which the six named plaintiffs and their class members allegedly worked for Champion – Champion contracted with forty-eight FLCs to plant tree seedlings by hand.[8] One of the FLCs was F & K Enterprises, the employer of the named plaintiffs.[9] F & K, which was headquartered in Hermitage, Arkansas, was a "leading" forestry FLC. With thirty-five to forty crews at its disposal, it provided laborers for dozens of customers in the forestry industry – large corporations, federal and state governments, and private land owners. F & K's crews had an average of eight to fourteen laborers and one foreman, who served as F & K's on-site representative. The foreman reported to one of six area supervisors, who, in turn, reported to F &

---

[7] An FLC is "any person, other than an agricultural employer, an agricultural association, or an employee of an agricultural association, who, for any money or other valuable consideration paid or promised to be paid [recruits, solicits, hires, employs, furnishes, or transports] any migrant or seasonal agricultural worker." 29 U.S.C. § 1802(6), (7). Among its many obligations, an FLC must obtain a certificate from the Secretary of Labor authorizing it to perform its duties. 29 U.S.C. § 1811(a).

[8] Champion would enter into a contract after soliciting bids from the FLCs it deemed qualified to do the work. Before submitting their bids, the FLCs would review Champion's planting specifications and inspect the tract of land to be planted to determine the condition of the soil. In some locations, Champion chose not to solicit bids; instead, it negotiated a contract. This was never the case with F & K; it obtained contracts with Champion through the bidding process.

[9] Although the record is not clear, F & K apparently employed other members of the plaintiff class.

4

K's president in Hermitage.

F & K employed hundreds of laborers during the planting seasons, recruiting most of them from Mexico. F & K would anticipate the number of laborers it would need to recruit by projecting its customers' requirements.[10] Once it obtained a planting contract, F & K would allocate from its pool of laborers the number needed to meet its contractual obligations. In the same way, F & K would anticipate the number of vehicles it would need to transport its laborers to and from the job site and the number of planting tools and seedling bags necessary to do the work.

The six named plaintiffs are migrant agricultural workers.[11] They contend that at various times between 1996 and 1999, they were employed by F & K to plant tree seedlings on land owned by Champion.[12] All six came from Mexico to

---

[10]  F & K never recruited any workers specifically to work on Champion's property.

[11] Congress defines "migrant agricultural worker" as "an individual who is employed in agricultural employment of a seasonal or other temporary nature, and who is required to be absent overnight from his permanent place of residence." 29 U.S.C. § 1802(8)(a).

[12]  In addition to planting tree seedlings, its contracts with Champion may have required F & K to engage in "brush clearing and pre-commercial thinning." The only relevant activity in this case, and for purposes of this appeal, is the planting of tree seedlings; hence, this opinion makes no further reference to these other activities.

the United States through the H-2B temporary visa program.[13] F & K picked them up at the Mexican-American border and transported them to Arkansas, where they received training on handling and planting the seedlings. After that, F & K sent them to a work site.[14] At the end of the planting season, which usually lasted four months, from November/December to February/March, F & K took them back to the Mexican-American border.

During the time they worked for F & K, the named plaintiffs worked in forests owned by various F & K customers in several states. Some were forests owned by Champion in Alabama, Tennessee, and Florida. This work was governed by six contracts that Champion and F & K entered into between 1996 and 1999. Given that the contracts with Champion amounted to a mere ten percent of F & K's business, however, plaintiffs spent only a small part of their time laboring on Champion land.[15] Moreover, their limited time there was unmemorable. Only

---

[13] The term "H-2B" is derived from the section of the Immigration and Nationality Act that authorizes the admission of aliens to perform unskilled work of a temporary nature. 8 U.S.C. § 1101(a)(H)(ii)(b).

[14] During the planting season, the named plaintiffs usually worked at several sites on land owned or managed by different foresters. In most cases, they did not know the identity of the forester. All they knew was that they were responsible to the F & K foreman supervising their work. They relied on him for their instructions and for their transportation to and from the job site.

[15] As detailed below, plaintiffs spent the vast majority of their time planting seedlings for the other landowners with whom F & K had contracts:
(1) Apolinar Martinez-Mendoza worked for F & K for six consecutive planting seasons in

three of plaintiffs are certain they were ever on Champion's land, and they say this only because they recall seeing Champion logos on trucks, boxes, or apparel. The three remaining plaintiffs are sure that they planted seedlings in Champion forests solely to the extent that they recall working in Alabama, Tennessee, or Florida.[16] None of the named plaintiffs ever spoke with Champion personnel.[17]

---

the latter half of the 1990's. He planted seedlings in several states for many forest owners with whom F & K had contracted. During the 1996-97 planting season, he worked nearly two months on Champion land. The next season he worked eight days on Champion land. In 1998-99 he spent three or four days on Champion land. The remaining three seasons he did not work on Champion land at all.

(2) Eliseo Morales-Caballero worked for F & K for three seasons, likewise planting seedlings in several states and for many landowners. He performed no work on Champion land during the first and last of those seasons. In the second season, 1996-97, he worked on Champion land in Florida for a few weeks, at most.

(3) Francisco Javier Miranda-Esquivel worked for F & K two seasons, similarly planting seedlings in several states for other landowners. He only performed work for Champion in his second season, 1996-97, and only for several weeks of that planting season.

(4) Paulo Morales-Martinez worked for F & K for two seasons, similarly planting seedlings in several states for other landowners. He only performed work for Champion in his second season, 1997-98, and only for two months, at most, of that planting season.

(5) Rogelio Morales-Martinez worked for F & K for six consecutive planting seasons in the latter half of the 1990's. He planted seedlings in several states for many forest owners, but only worked on Champion land for parts of two seasons – 1996-97 and 1997-98.

(6) Francisco Perez-Delgado worked for F & K for two seasons. He planted seedlings in several states and for other landowners, working on Champion land for eleven days during the 1997-98 planting season, and several weeks of the 1998-99 planting season.

[16] The three plaintiffs who "knew" they were on Champion land only guessed at the time that Champion owned the land.

[17] As discussed infra, note 30, the only communication between plaintiffs and Champion occurred on one occasion when a Champion employee instructed a group of laborers (including at least one plaintiff) on the proper handling of plant seedlings.

B.

As noted, plaintiffs and the members of their class seek the recovery of the minimum wages and overtime compensation provided by the Fair Labor Standards Act ("FLSA") and the damages provided by the Migrant and Seasonal Agricultural Worker Protection Act ("MSAWPA").[18]  After extended discovery, parties filed cross-motions for summary judgment as to whether Champion was plaintiffs' joint employer under either statute.  The district court deferred its consideration of the class action certification issues pending its disposition of the cross-motions for summary judgment.

In presenting their motion, plaintiffs relied heavily upon the provisions contained in the six contracts mentioned above – specifically the planting specifications.  They argued that the precision with which they had been drafted showed that Champion ultimately controlled every facet of their work, such as to render it their joint employer.[19]  Champion's position, on the other hand,

---

[18]  Champion brought third-party actions for indemnification against F & K and the other farm labor contractors who employed plaintiffs and their class members.  These third-party claims are not before us; hence, we do not discuss them.

[19]  While each of the six contracts were distinct, they shared many of the same provisions. For instance, the contracts specified the general time of year in which the planting was to be done, the method of calculating payment to F & K (which depended on proper planting), and the general requirements for planting seedlings, such as (1) the handling of the seedlings, (2) the spacing of the seedlings, (3) the methods for planting the seedlings, and (4) the types of tools to be used.
As Champion correctly observes, the contractual specifications for planting seedlings

emphasized that there was no interaction between Champion and plaintiffs, and that the evidence clearly indicated that F & K was their sole employer. As for plaintiffs' point about the specifications, Champion contended that the contracts with F & K were the products of arms' length negotiations, and that the planting specifications represented industry standards.[20]

The district court granted Champion's motion for summary judgment (and simultaneously denied plaintiffs' motion). The court thereafter gave Champion final judgment. It did so without ruling on the class certification issues the parties had raised.

Plaintiffs now appeal, contending that the court should have granted it summary judgment on the ground that Champion was a joint employer as a matter of law.[21] They also contend that the court should have addressed the class

---

were similar to the specifications utilized by other forestry companies, the United States Department of Agriculture, state agencies, and various industry associations.

[20] Moreover, Champion asserted, the contracts clearly indicated that F & K was plaintiffs' sole employer. In every contract, F & K alone agreed to furnish the labor, supervision, equipment, and transportation necessary to fulfill the planting requirements. Most contracts also stated that Champion had no role in selecting F & K's laborers, and that these laborers were not "subject to any orders, directions or control of Champion."

[21] In reviewing a district court's grant of summary judgment, we consider the evidence in the light most favorable to the party against whom judgment has been granted and, doing so, determine whether any material facts remain to be litigated. See Squish La Fish, Inc. v. Thomco Specialty Prods., Inc., 149 F.3d 1288, 1290 (11th Cir. 1998). In this case, both parties filed motions for summary judgment, thus representing to the district court that the material facts are not disputed. We agree with their representations. Our task therefore, as we explain in part III, is

certification issues.  We address their contentions in turn.

## II.

In 1983, Congress enacted the Migrant and Seasonal Agricultural Worker Protection Act "to remove the restraints on commerce caused by activities detrimental to migrant and seasonal agricultural workers . . . and to assure necessary protections for migrants and seasonal agricultural workers . . . ."  29 U.S.C. § 1801.  The MSAWPA requires agricultural employers to register with the government, maintain employment records for workers, and comply with various compensation, housing, and transportation provisions.[22] See 29 U.S.C. §§ 1811-44.  Anyone aggrieved as a result of an employer's failure to discharge these responsibilities may bring a private right of action in a United States district court, for both legal and equitable relief.  29 U.S.C. § 1854(a), (c).[23]

Champion's liability under the MSAWPA, and the FLSA as well, depends

---

to determine whether the circumstantial facts support the district court's ultimate finding that Champion was not the named plaintiffs' employer as alleged in the complaint.

[22]  The MSAWPA defines "agricultural employer" as "any person who owns or operates a farm, ranch, processing establishment, cannery, gin, packing shed or nursery, or who produces or conditions seed, and who either recruits, solicits, hires, employs, furnishes, or transports any migrant or seasonal agricultural worker."  18 U.S.C. § 1802(2).

[23]  See supra notes 1 & 2.

on whether Champion "employed" plaintiffs. The definition of "employ" is the same under both statutes: an entity "employs" a person if it "suffers or permits" the individual to work.[24]  See 29 U.S.C. § 203(g); 29 U.S.C. § 1802(5).  "An entity 'suffers or permits' an individual to work if, as a matter of economic reality, the individual is dependent on the entity."  Charles v. Burton, 169 F.3d 1322, 1328 (11th Cir. 1999) (citation omitted).  Since joint employment relationships – where a single individual stands in the relation of an employee to two or more persons at the same time – are common in agriculture, see 29 C.F.R. § 500.20(h)(5),[25] both statutes deliberately make "it clear that a worker can be economically dependent on, and thus jointly employed by, more than one entity at the same time."[26]

Antenor v. D & S Farms, 88 F.3d 925, 929 (11th Cir. 1996).

_____

[24]  In a case brought under both statutes, as here, we held that in enacting the statutes, Congress expressly rejected the common-law definition of employment.  Antenor v. D & S Farms, 88 F.3d 925, 929 (11th Cir. 1996).

[25]  In 1997, the Department of Labor amended its regulation in an attempt to clarify the "joint employment" definition.  See 62 Fed. Reg. 11734 (1997) (codified at 29 C.F.R. § 500.20 (1997)).  This court, as required by Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S. Ct. 2778, 81 L.E. 2d 694 (1984), accords significant weight to the statutory interpretation of the executive agency charged with implementing the statute being construed, particularly where, as here, that interpretation is incorporated in a formally published regulation.  Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d 1500, 1507 (11th Cir. 1993).

[26]  The federal regulation states that the joint employer doctrine is a "central foundation" of the MSAWPA because it is "the best means" to fulfill the purpose of the act, which is "to reverse the historical pattern of abuse and exploitation of migrant and seasonal farm workers." 29 C.F.R. § 500.20(h)(5).  The joint employer doctrine effects this purpose by protecting "all those hired by middlemen to toil in our nation's fields, vineyards, and orchards."  Caro-Galvan, 993 F.2d at 1505 (citation and internal quotation mark omitted).

11

Moreover, "even if a farm labor contractor is found to be a bona fide independent contractor, this status does not as a matter of law negate the possibility that an agricultural employer may be a joint employer of the [laborers] together with the farm labor contractor." 29 C.F.R. § 500.20(h)(5)(ii) (internal quotation mark omitted). If, as a matter of economic reality, a laborer is dependent upon both the FLC and the agricultural employer, then a joint employment relationship exists, and the laborer will be considered an employee of both entities. See Antenor, 88 F.3d at 930. On the other hand, if the two entities are commonly disassociated with respect to the employment of a particular employee, a joint employment situation does not exist. See 29 C.F.R. § 500.20(h)(5).

Ultimately, the determination of whether a laborer furnished by a FLC was economically dependent on, and consequently jointly employed by, an agricultural employer depends upon all the facts and circumstances in the particular case. See Antenor, 88 F.3d at 932. Thus, "the focus of each inquiry must be on each employment relationship as it exists between the worker and the party asserted to be a joint employer." Id. (citation and quotation marks omitted). The drafters of the MSAWPA regulations, and this court in Charles, considered several factors in making such a determination:

    (1) whether the agricultural employer has the power, either alone or

12

through the FLC, to direct, control, or supervise the worker or the work performed (such control may be either direct or indirect, taking into account the nature of the work performed and a reasonable degree of contract performance oversight and coordination with third parties);
(2) whether the agricultural employer has the power, either alone or in addition to another employer, directly or indirectly, to hire or fire, modify the employment conditions, or determine the pay rates or the methods of wage payment for the worker;
(3) the degree of permanency and duration of the relationship of the parties, in the context of the agricultural activity at issue;
(4) the extent to which the services rendered by the worker are repetitive, rote tasks requiring skills which are acquired with relatively little training;
(5) whether the activities performed by the worker are an integral part of the overall business operation of the agricultural employer;
(6) whether the work is performed on the agricultural employer's premises, rather than on premises owned or controlled by another business entity; and
(7) whether the agricultural employer undertakes responsibilities in relation to the worker which are commonly performed by employers, such as preparing and/or making payroll records, preparing and/or issuing pay checks, paying FICA taxes, providing workers' compensation insurance, providing field sanitation facilities, housing or transportation, or providing tools and equipment or materials required for the job (taking into account the amount of the investment).

See 29 C.F.R. § 500.20(h)(5)(iv)(A)-(G); Charles, 169 F.3d at 1328-29.

These factors guide our analysis of the economic reality in the case at hand, with the caveat that no one factor is dispositive. In entertaining and assessing the evidence relevant to the inquiry called for by a given factor, the question the district court must ask itself is whether such evidence, considered as a whole,

supports (or fails to support) the laborer's claim that he is economically dependent on the putative employer, in this case Champion.[27]  The facts the court finds at the end of each inquiry become pieces of circumstantial evidence which, together, yield inferentially one of two ultimate facts: joint employment exists or it does not.[28]  Because the laborer has the burden of proof, to prevail he must establish the joint-employment inference by a preponderance of the evidence.  In reviewing the district court's findings of fact with respect to the factors it examines, we give the court the benefit of the clearly erroneous rule.  Whether those findings – the circumstantial facts – support the ultimate fact the court finds is a question of law, which we review de novo.  Aimable v. Long and Scott Farms, 20 F.3d 434, 440 (11th Cir. 1994).

## A.

1. Whether Champion had the power, either alone or through F & K, to direct, control, or supervise the laborers.

---

[27]  In entertaining and assessing the evidence with respect to a factor, the court is, in effect, conducting a miniature bench trial.

[28]  Because the laborer, as the plaintiff, has the burden of proof, the court may, given the circumstantial evidence, refrain from finding the ultimate fact.  In other words, the court may simply conclude that the laborer has failed to satisfy his burden of proof.

We have traditionally divided this factor into two concepts: first, the nature and degree of control of the laborers, and second, the degree of supervision over their work. See, e.g., Charles, 169 F.3d at 1329-31; Antenor, 88 F.3d at 933-35; Aimable, 20 F.3d at 440-42. As for the first concept, we have observed that control arises when the alleged employer "goes beyond general instructions, such as how many acres to pick in a given day, and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work." Aimable, 20 F.3d at 441. An alleged employer takes an "overly active" role when it decides such things as (1) for whom and how many employees to hire; (2) how to design the employees' management structure; (3) when work begins each day; (4) when the laborers shall start and stop their work throughout the day; and (5) whether a laborer should be disciplined or retained. Charles, 169 F.3d at 1329. "Agricultural decisions – decisions which only indirectly affect[] the number of workers necessary to harvest the land – cannot be likened to 'control' in the FLSA/MSAWPA sense." Aimable, 20 F.3d at 441.

In this case, it is undisputed that none of these indicia of control are present. Champion did not – and could not – assign laborers or tasks, dictate hiring decisions, design the laborers' management structure, govern the laborers' work

15

schedule, or implement laborer discipline.[29] Despite this, plaintiffs repeat the argument they addressed to the district court: Champion's "exceptionally precise" planting specifications provided the roots for a "pervasive regime of control." In plaintiffs' view, these specifications – in covering (1) the handling of the seedlings, (2) the spacing of the seedlings, (3) the methods for planting the seedlings, and (4) the types of tools to be used in planting – left "virtually nothing" to F & K's discretion. In short, Champion totally controlled the manner in which the laborers' did their work.[30] We are unpersuaded for several reasons.

First, the facts clearly refute the claim that Champion controlled plaintiffs' work. Plaintiffs concede that they neither saw nor relied on the planting specifications contained in F & K's contracts with Champion in any way. In fact, they were completely unaware of the specifications. Each plaintiff was trained

---

[29] Plaintiffs do dispute one indicia. They contend that Champion's contractual right to stop the seedling planting when soil conditions were poor – due, for example, to "adverse" weather – shows that Champion had the power to direct the starting and stopping of the laborers' work throughout the day. We disagree. The power to halt planting based on poor soil conditions is a general agricultural decision, which is quite distinct from the non-agricultural situation in Antenor – where a grower suspended work to verify that all the workers were in compliance with immigration laws – that plaintiffs rely on for support.

[30] In further support of their claim that Champion had a "pervasive regime of control," plaintiffs cite to one instance in which a Champion employee instructed a group of laborers on how not to bend the plants while handling and planting them. While observing the obvious – that one instance does not constitute a regime, much less a pervasive one – we note that proper planting and handling techniques are agricultural decisions that do not amount to control under the FLSA or MSAWPA.

solely by F & K according to F & K's planting methods, which met or exceeded Champion's specifications.[31] F & K's high planting standards allowed plaintiffs to be transferred from forest to forest without the need for retraining. Indeed, other than occasional differences in spacing requirements, plaintiffs planted the same way regardless of whose land they were planting. Champion's specifications can therefore hardly be said to have controlled their behavior.[32]

Second, the drafting of planting specifications is unquestionably an agricultural decision which does not constitute the type of "control" that the FLSA and MSAWPA address. Third, plaintiffs' argument runs directly counter to the comments the Department of Labor made in promulgating its regulations:

> It should be noted that indirect control sufficient to indicate the existence of an employment relationship between a grower and an a FLC's crewmembers would not be established solely by contractual terms through which the grower's ultimate standards or requirements for

---

[31] Champion's planting specifications were largely a matter of common sense to F & K and the other FLCs with whom Champion dealt. The specifications were industry standard and quite similar to the planting specifications made part of virtually all of F & K's other hand-planting contracts. It is therefore not surprising that F & K, which focused its work on the forestry industry, would have its own planting specifications that at least matched Champion's.

[32] Plaintiffs advance a fallback control argument, that Champion's planting specifications slowed their work and thereby lowered their wages. The evidence unequivocally establishes, however, that F & K's contracts with Champion were the products of arms' length negotiations. F & K was aware of the planting specifications each time it chose to bid on a Champion proposal. Thus, before formulating its price, F & K assessed the possible negative effects the specifications might have on the laborers' pay and therefore its profits. Plaintiffs are accordingly incorrect in their assertion that Champion controlled their wages.

the FLC's performance are defined (e.g., the grower's specification of the size or ripeness of the produce to be harvested, or of the date for the FLC's completion of the job). Such stated performance standards or objectives – which are common in contracts for services in the agricultural industry and in other contexts – would not, in themselves, constitute indirect control of the work by the person for whose benefit the services are to be performed (e.g., the grower).

Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. 11,734, 11,739-40 (March 12, 1997). Here, contrary to the position the Department takes in its regulations, plaintiffs attempt to establish control solely on the basis of the contract specifications that set F & K's performance standards. We agree with the district court; the specifications fail as an exclusive element of control.

As for the second concept, the degree of supervision over the laborers, "it is well settled that supervision is present whether orders are communicated directly to the laborer or indirectly through the contractor." Charles, 169 F.3d at 1330 (citation omitted). On the other hand, infrequent assertions of minimal oversight do not constitute the requisite degree of supervision. Id. The record in this case reveals that Champion engaged in very little, if any, supervision. On deposition, plaintiffs themselves described Champion's supervision as very rare and infrequent, and admitted that they relied exclusively upon the F & K foremen for supervision and direction. While it is uncontested that Champion personnel were

18

present on the job sites, they did not supervise the laborers; they were there simply to ensure that F & K complied with the contract specifications. Such oversight is specifically permitted by the regulations:

> The agricultural employer/association may certainly take action during or after the conclusion of the work to confirm satisfaction of the contract's ultimate performance standards (including appearing in the field and communicating with the FLC about general observations concerning performance of the contract standards, such as ripeness or size of the produce harvested) without this action alone being considered an indicium of joint employment. . . . [A] reasonable degree of contract performance oversight . . . is permissible.

Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. at 11,740.

In sum, Champion's supervision was at most de minimis, and did not rise to the level of supervision necessary to satisfy this factor. We also conclude that the record contains no evidence that Champion controlled plaintiffs' employment. The first factor, therefore, weighs against a finding of joint employment.

2. Whether Champion had the direct or indirect power to (1) hire or fire, (2) modify the employment conditions, or (3) determine the pay rates or the methods of wage payment for the laborers.

19

The second indicator of joint employment required the district court to consider whether Champion had the power to hire or fire the laborers, modify their employment conditions, or determine the rate of pay they should receive and how they should be paid. Plaintiffs do not contend that Champion had the power to hire or fire them, or set their pay. Instead, plaintiffs half-heartedly assert that Champion possessed the power to modify their employment conditions because it could determine when planting started, where it took place, and how long it lasted. They base their assertion solely on Champion's contractual right to stop planting due to adverse weather or poor soil conditions.

Putting aside the fact that determining whether planting should continue in adverse weather or poor soil conditions is quintessentially an agricultural decision, the right to halt planting under those conditions could hardly amount to circumstantial evidence – whether considered in isolation or in combination with the other evidence in the case – that Champion was plaintiffs' employer. The evidence is unmistakable: Champion had no control over the laborers working conditions. F & K's foremen determined when they began working in the morning, when they took lunch or rest breaks, and when they quit for the day. Likewise, F & K could shift a laborer from one task to another, punish him if necessary, or alter his pay. See Aimable, 20 F.3d at 442. Contrast Antenor, 88 F.3d at 935 (finding

20

economic dependence when grower dictated the workers' hours by deciding when work began each day, by halting picking when prices were low, and by hiring other workers). This factor, like the first factor, weighs against a finding of joint employment.

3. The degree of permanency and duration of the relationship of the parties.

The third regulatory factor indicates the degree of permanency and duration of the relationship between the laborer and the alleged employer. Where an FLC and its workers are engaged for the duration of the operation and are obligated to work exclusively for the employer at its discretion, this factor would suggest economic dependence. See Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. at 11,740. Plaintiffs concede, however, that they did not have a "particularly permanent relationship" with Champion and that this factor "suggests a lack of economic dependence." Indeed, plaintiffs only worked scattered weeks, at most, on Champion property, never spoke with Champion personnel, and generally never even knew that Champion was the recipient of their efforts. We find that this factor weighs against a determination that plaintiffs were jointly employed by Champion.

21

4. The extent to which the services rendered by the laborers are repetitive, rote tasks requiring skills which are acquired with little training.

The fourth regulatory factor focuses on the extent to which the services rendered by the laborers are repetitive, rote tasks that required little training to learn. The lower the worker's skill level, the lower the value and marketability of his services, and the greater the likelihood of his economic dependence on the person utilizing those services.[33] See Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. at 11,740-41. While on the surface planting seedlings appears to be a rote task easily learned, the evidence in the record paints a less clear picture. For example, tree planters must learn to (1) cull defective seedlings, (2) determine the proper depth to plant the seedlings, (3) place the seedlings in the ground at the correct angle, (4) plant the seedlings with straight roots, (5) pack the seedlings tightly, and (6) measure appropriate spacing between the trees. Several plaintiffs, including the ones with several years of planting experience, acknowledged that it is difficult to master these skills. Even so, most laborers were

---

[33] In Aimable, 20 F.3d at 444, we concluded that this factor is irrelevant to a determination of joint employment. The Department of Labor disagreed with our conclusion, and we defer to its judgment. Even so, we have difficulty discerning the probative value of this factor in resolving, one way or the other, the issue of joint employment. See id.

able to effectively, albeit imperfectly, learn their job with relatively little training.

Overall, we think this factor cuts slightly in favor of economic dependence. Although the planting of seedlings certainly requires more skill and is less rote than picking snap beans, see Charles, 169 F.3d at 1332, the amount of training required to perform the task is minimal, and most anyone could pick up the requisite skill.

5. Whether the activities performed by the laborers are an integral part of Champion's overall business.

The next regulatory factor assesses whether the activities performed by the laborers were an integral part of Champion's overall business operation. "This factor is probative of joint employment because a worker who performs a routine task that is a normal and integral phase of the grower's production is likely to be dependent on the grower's overall production process." Antenor, 88 F.3d at 937. A task or activity is considered "integral" to an employer's business when that employer "would be virtually certain to assure that the function is performed, and would obtain the services of whatever workers are needed for this function . [Accordingly, t]he workers so engaged can reasonably anticipate that the work will

23

be available for so long as the function in question must be performed." Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. at 11,741. In other words, to demonstrate economic dependency on Champion, plaintiffs had to show that their role as hand-planters of tree seedlings was "indispensable" to Champion's business. See Antenor, 88 F.3d at 937.

The district court determined that the laborers had failed to make this showing, and we agree. The record simply does not support the contention that Champion depended upon hand-planting of tree seedlings to run its business. Champion's forestry operations constituted a small portion of its overall business. Moreover, the timber provided by Champion's forestry operations comprised only a fraction of the timber Champion needed to supply its paper mills. Champion purchased the majority of its timber on the open market. It is clear, therefore, that Champion's overall business did not rely on its forestry operations.

Even if we were to assume, however, that Champion's forestry operations were integral to its overall business, the evidence demonstrates that hand-planting of seedlings was not indispensable to its forestry operations. Forests will regenerate naturally over time, and a large portion of Champion's land holdings from 1996-99 were regenerated without the planting of seedlings. Furthermore, in those areas that Champion did decide to plant seedlings, hand-planting was

24

unnecessary. Instead, most seedlings could have been – and in fact many were – planted by machine. In short, Champion did not need to plant tree seedlings by hand in order to maintain its forests or operate its overall business. The fifth factor weighs against a finding of joint employment.

6. Whether the work was performed on Champion's premises.

The sixth factor examines whether the laborers worked on Champion's or someone else's land. "This factor is probative of joint employment because without the land, the worker might not have work, and because a business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors." Charles, 169 F.3d at 1333 (internal quotation marks and citation omitted). There is no dispute here that plaintiffs worked on Champion's forest lands. This factor would accordingly appear at first blush to weigh unequivocally in plaintiffs' favor.

A closer look indicates that the weight of plaintiffs having worked on Champion's lands might be that of a feather. Plaintiffs worked the vast majority of their time on land not owned by Champion. More significantly, they never took a job with F & K premised upon the knowledge that they would be planting on

25

Champion land. Nor did it matter to them. They transferred from forest to forest, generally unaware of and unconcerned about who possessed the land. Plaintiffs who did "know" they were on Champion land knew so only cryptically – based on the Champion logos they happened to observe. Champion could have been a contractor hired to manage the landowner's forests, rather than the landowner itself, and plaintiffs would have been blissfully ignorant.

Given plaintiffs' lack of knowledge and concern regarding whether Champion was the owner of the land on which they were working, it cannot be said they relied upon or anticipated Champion's business for a source of their income. See Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. at 11,741 ("The workers' reliance upon a source or place of work (and, consequently, a source of income in the form of wages for services) [should] appropriately be considered in the determination of an employment relationship.") In light of this, the fact that plaintiffs performed their hand-planting services on Champion land possesses little probity on the issue of whether they were economically dependent on Champion. We therefore conclude that while the sixth factor may cut in favor of joint employment, it does so only slightly.

7. Whether Champion undertook responsibilities in relation to the laborers that

employers commonly perform.

The final factor examines whether Champion undertook responsibilities for workers often undertaken by employers, such as (1) preparing and/or making payroll records, (2) preparing and/or issuing pay checks, (3) paying FICA taxes, (4) providing workers' compensation insurance, (5) providing field sanitation facilities, housing or transportation, or (6) providing tools and equipment or materials required for the job. The provision of such services "is both an objective manifestation of employer status and strong evidence of the workers' economic dependence upon [it]." Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. at 11,741-2. It is undisputed that Champion provided none of these services; F & K alone prepared the laborer's payroll records and checks, paid their FICA taxes, provided their housing, transportation, tools, etc. Accordingly, the seventh factor weighs strongly against a finding that Champion was plaintiffs' joint employer.

B.

As should be apparent from our discussion, the foregoing factors yield pieces of circumstantial evidence. Our task is to determine whether these pieces,

27

considered together, yield the inference that Champion was plaintiffs' employer as they alleged in their complaint. Two factors generated circumstantial evidence which points toward a finding that Champion was plaintiffs' employer jointly with F & K. Five factors, however, generate circumstantial evidence which points in the opposite direction, against a finding of such employment. This evidence more than outweighs the evidence generated by the other two factors. In sum, the record conclusively establishes that plaintiffs were solely employed by, and economically dependent upon, F & K – a large, legitimate business with a broad client base, numerous full-time employees, and substantial amount of equipment. We therefore affirm the district court's decision granting Champion summary judgment.

## III.

Plaintiffs brought this case as a class action, as authorized by the FLSA and the MSAWPA. See supra note 1. Rule 23(c)(1) of the Federal Rules of Civil Procedure requires that the district court determine "as soon as practicable" after the lawsuit is filed whether the class action is to be so maintained.[34] The lawsuit

---

[34] Rule 23(c)(1) provides:
> As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.

was filed on January 26, 2000; on May 4, 2000, the district court entered a

scheduling order which, among other things, postponed consideration of class

certification until after it decided whether Champion was plaintiffs' employer. The

order gave the parties until May 11, 2001, to file pleadings that would require the

court to address that question. The court subsequently extended this deadline to

June 29, 2001. On that date, both plaintiffs and Champion filed motions for

summary judgment. On March 18, 2002, the court ruled, granting Champion's

motion. A final judgment in favor of Champion was entered the same day. As we

observed at the outset, the court entered final judgment without addressing the

class certification issue.[35]

The district court erred in failing to address the issue. The court apparently

---

[35] A district court's failure to determine prior to the entry of final judgment whether the case should proceed as a class action may deprive its judgment of the requisite finality for appealability under 28 U.S.C. § 1291 (and thereby deprive us of our jurisdiction over the appeal). Our research fails to disclose an Eleventh Circuit case, such as the one before us, in which the district court failed to rule on class certification. The Seventh Circuit, however, has faced the issue on several occasions. Its jurisprudence guides our analysis. Where a district court deliberately reserves ruling on class certification pending an appeal of its order granting summary judgment, there is no final judgment and the court of appeals lacks jurisdiction to hear the appeal. Glidden v. Chromalloy Am. Corp., 808 F.2d 621, 623 (7th Cir. 1986). On the other hand, where a district court retains nothing for later decision – i.e., treats the litigation as having ended – the court's judgment is final, and the appeal may go forward. See Hickey v. Duffy, 827 F.2d 234, 238 (7th Cir. 1987).

In this case, it is apparent that the district court believed the litigation was over. Its entry of "final" judgment concomitant with its order granting summary judgment clearly indicated that it contemplated no further proceedings in the case. We accordingly conclude that we have jurisdiction over this appeal.

thought that its decision granting Champion summary judgment on the employer issue automatically disposed of the class certification issue. That is, having lost their cases on the merits, the named plaintiffs would be unable as a matter of law to represent the class. The court was incorrect. The law of this circuit is to the contrary: a plaintiff's capacity to act as representative of the class is not ipso facto terminated when he loses his case on the merits. See Satterwhite v. City of Greenville, 634 F.2d 231 (5th Cir. Jan. 1981) (en banc);[36] Armour v. City of Anniston, 654 F.2d 382 (5th Cir. Unit B Aug. 1981) (per curiam); see also Armstrong v. Martin Marietta Corp., 138 F.3d 1374, 1383 n.16 (11th Cir. 1998) (en banc) (noting that in some cases the named plaintiff may appeal a denial of class certification even if she ceases individually to have a controversy with the defendant). Consequently, even after finding against plaintiffs on the merits, the court should have determined whether the class action could be maintained, and whether the plaintiffs could represent that class.[37]

---

[36] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[37] Under Rule 23(c)(1) "[t]he trial court has an independent obligation to decide whether an action was properly brought as a class action, even where[, as here,] neither party moves for a ruling on class certification." McGowen v. Faulkner Concrete Pipe Co., 659 F.2d 554, 559 (5th Cir. Unit A Oct. 1981); accord Phillips v. Joint Legislative Comm. on Performance & Expenditure Review of Miss., 637 F.2d 1014, 1022 n.9 (5th Cir. Feb. 1981). The complaint in this case was brought as a class action. The district court accordingly was obligated to address class certification, regardless of whether the parties moved for resolution of the issue.

As an appellate court, we are unable to review class certification decisions before they are made. Wade v. Kirkland, 118 F.3d 667, 670 (9th Cir. 1997). We must therefore remand the case to the district court for further proceedings. As we instructed the district court in Satterwhite, the court's first task will be to determine whether a case or controversy exists, as required by Article III, Section 3, of the United States Constitution. If a live controversy exists, the court must then determine whether the case is appropriate for class certification.[38] If it is, the court must go on to decide whether any of the named plaintiffs are qualified to serve as class representative and, if not qualified, whether a member of the class is willing and qualified to serve as class representative.

## IV.

For the foregoing reasons, we AFFIRM the district court's decision granting Champion summary judgment. We VACATE the court's final judgment, however, and REMAND the case for further proceedings not inconsistent with what we have said in part III.

SO ORDERED.

---

[38] We are aware of Local Rule 23.1(b) for the Northern District of Florida, which imposes on class action plaintiffs a duty to move for class certification within ninety days of filing their complaint. Our opinion should not be read to limit the district court's application of the local rules or the court's ability to sanction plaintiffs for noncompliance with the rules.